Kevin H. Marino
John D. Tortorella
MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, NJ 07928
Tel: (973) 824-9300
kmarino@khmarino.com
jtortorella@khmarino.com

Meaghan VerGow (*pro hac vice*)
Brian D. Boyle (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Tel: (202) 383-5300
mvergow@omm.com
bboyle@omm.com

*Attorneys for Defendants Morgan Stanley,
Morgan Stanley Smith Barney LLC, and
Morgan Stanley Compensation Management
Development and Succession Committee*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ARTHUR MARTIN AND WADE MARTIN,<br><br>Plaintiffs,<br><br>-against-<br><br>MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, MORGAN STANLEY COMPENSATION MANAGEMENT DEVELOPMENT AND SUCCESSION COMMITTEE, and John Does 1-20,<br><br>Defendants. | Case No. 3:25-cv-12740-MAS-TJB<br><br>Hon. Michael A. Shipp, U.S.D.J.<br><br><br>**CERTIFICATION OF BALAZS KATONA IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND TO STAY PROCEEDINGS** |

I, Balazs Katona, declare and state as follows:

1.      I am currently employed as an Executive Director at Morgan Stanley, overseeing financial advisor compensation in Field Business Management (previously called the Office of Business Management) within Morgan Stanley Wealth Management.  I joined Morgan Stanley in September 2007 and have been in my current position since 2021.  Prior to this role, I held various roles in the Wealth Management Finance organization.

2.      I submit this certification in support of the motion of Defendants Morgan Stanley, Morgan Stanley Smith Barney LLC, and the Morgan Stanley Compensation Management Development and Succession Committee to compel arbitration of the claims in this action. Based on my role and responsibilities at Morgan Stanley, I have personal knowledge of the following facts and, if called and sworn as a witness, could and would testify competently thereto.

3.      In connection with making this certification, I reviewed records compiled, maintained, and relied on in the normal course of business by Morgan Stanley, and to which I have access in my role as Executive Director in Field Business Management.

4.      Morgan Stanley is a financial services firm that provides investment banking, securities, and investment management and wealth management services to clients across the globe.

5.      The firm's records show that plaintiff Arthur Martin was employed by Morgan Stanley as a Financial Advisor from August 13, 2010, until his resignation effective October 2, 2020.

6.      The firm's records show that plaintiff Wade Martin was employed by Morgan Stanley as a Financial Advisor from August 18, 2010, until his resignation effective October 2, 2020.

7.    The firm's records reflect that the earliest scheduled vesting date for the deferred awards at issue in this matter was January 25, 2021, more than three months after the plaintiffs departed Morgan Stanley.

8.    The firm's records reflect that plaintiffs were credentialed financial professionals who were routinely called upon to understand and advise clients on complex investment and other financial matters.

9.    Attached hereto as Exhibit A is a true and correct copy of a document titled "Morgan Stanley Financial Advisor/Private Wealth Advisor Compensation Plan, Growth Award and Recognition Programs 2015," dated January 12, 2015.

10.    Attached hereto as Exhibit B is a true and correct copy of the Growth Award Bonus Agreement between plaintiff Arthur Martin and Morgan Stanley Smith Barney LLC, dated February 16, 2016.

11.    The firm's records show that pursuant to this Growth Award Bonus Agreement, Morgan Stanley paid Arthur Martin $10,111.86 in 2017, $9,752.52 in 2018, $9,833.17 in 2019, and $9,693.83 in 2020.

12.    Attached hereto as Exhibit C is a true and correct copy of the Growth Award Bonus Agreement between plaintiff Wade Martin and Morgan Stanley Smith Barney LLC, dated February 16, 2016.

13.    The firm's records show that pursuant to this Growth Award Bonus Agreement, Morgan Stanley paid Wade Martin $25,473.88 in 2017, $25,122.85 in 2018, $24,771.81 in 2019, and $24,420.77 in 2020.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 4th day of August 2025, in Purchase, New York.

Balazs Katona

# EXHIBIT A

# Morgan Stanley

# Financial Advisor/ Private Wealth Advisor Compensation Plan, Growth Award and Recognition Programs 2015

Compensation and Recognition Program

CONFIDENTIAL—FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

# Morgan Stanley

# » Financial Advisor / Private Wealth Advisor
## Compensation Plan, Growth Award and Recognition Programs 2015

## TABLE OF CONTENTS

1. Compensation Programs
   1.1 Salary ................................................ 2
   1.2 Incentive Compensation ........................... 3
2. Growth Award
   2.1 Growth Award ..................................... 17
   2.2 Growth Premium ................................... 17
   2.3 Lending Award ..................................... 20
3. Other Programs
   3.1 Capital Accumulation Program ................. 23
   3.2 Former Advisor Program ......................... 24
   3.3 Business Development Allowance ........... 25
   3.4 Alternative Flexible Grid ........................ 25
   3.5 Discretionary Fee Waiver
       Allowance ........................................... 26
4. Recognition Programs
   4.1 Club Memberships for 2016 ..................... 27
   4.2 Titles ................................................ 28
5. Other
   5.1 Summary and Additional
       Information .......................................... 29
   5.2 Version History ................................... 30

*This document will be periodically updated with any changes. To obtain the latest version, visit the 2015 FA/PWA Compensation website on 3DR > Practice > FA Compensation 2015. In addition, the most recent version of the detailed 2015 Product Appendix is available on the website.*

### Introduction
The Morgan Stanley Wealth Management Financial Advisor / Private Wealth Advisor ("FA/PWA") Compensation Plan provides FA/PWAs with a guaranteed salary as well as an opportunity to generate significant additional income through Incentive Compensation and the Growth Award.

### Incentive Compensation
Eligibility is based on Total Credits (based on the Credit Rate Schedule and Credit Rate Schedule Exceptions described in sections 1.2.1 & 1.2.6) derived from total annual Gross Revenue and the rules and conditions set forth in this Program. The Credit Rate Schedule provides the opportunity for increasing Incentive Compensation through a retroactive escalating grid. Incentive Compensation is comprised of Cash Credits which are awarded each month as an advance, and Deferred Credits which accrue each month and are awarded in early 2016.

### Growth Award
2015 Growth Award is comprised of the following components:
- **Growth Premium** is designed to reward FA/PWAs who grow their Gross Revenue. FA/PWAs who qualify for the Growth Premium are also eligible for:
  - **25% Additional Business Development Allowance ("BDA")** provided to invest even more in FA/PWA businesses that are growing
  - **Client Service Associate ("CSA") "Go for Growth" Award** provided to thank our CSAs who support their FA/PWA in their growth
- **Lending Award** is designed to reward FA/PWAs for utilizing Lending opportunities consistent with their clients' best interests

The Growth Premium and Lending Award are calculated annually and will be awarded in the first quarter of 2016.

Confidential- for internal Morgan Stanley Wealth Management use only. Not to be displayed or distributed to the general public

**SECTION 1: Compensation Programs**

### HOW IT ADDS UP:

**Total Potential Income and Growth Award**[1,2]

(Assumes Top 5% Positive Gross Revenue Growth by LOE band)

| Annual Gross Revenue ($) | Lending Growth ($) | Length of Service / Length of Experience (years) | | | | |
|---|---|---|---|---|---|---|
| | | 4 | 10 | 15 | 20 | 25 |
| 5,000,000 | 45,000,000 | 59.6% | 62.1% | 62.6% | 63.1% | 63.6% |
| 3,000,000 | 35,000,000 | 58.1 | 60.6 | 61.1 | 61.6 | 62.1 |
| 2,500,000 | 30,000,000 | 57.1 | 59.6 | 60.1 | 60.6 | 61.1 |
| 2,200,000 | 25,000,000 | 55.7 | 58.2 | 58.7 | 59.2 | 59.2 |
| 1,650,000 | 20,000,000 | 55.3 | 57.8 | 58.3 | 58.3 | 58.3 |
| 1,100,000 | 15,000,000 | 54.6 | 57.1 | 57.1 | 57.1 | 57.1 |
| 880,000 | 12,500,000 | 52.3 | 54.3 | 54.3 | 54.3 | 54.3 |
| 825,000 | 10,000,000 | 50.9 | 52.9 | 52.9 | 52.9 | 52.9 |
| 660,000 | 7,500,000 | 50.0 | 52.0 | 52.0 | 52.0 | 52.0 |
| 550,000 | 5,000,000 | 48.2 | 50.2 | 50.2 | 50.2 | 50.2 |
| 440,000 | 3,500,000 | 47.8 | 48.3 | 48.3 | 48.3 | 48.3 |
| 385,000 | 2,500,000 | 44.3 | 44.3 | 44.3 | 44.3 | 44.3 |
| 330,000 | 1,500,000 | 41.6 | 41.6 | 41.6 | 41.6 | 41.6 |
| 275,000 | 750,000 | 41.0 | 20.0 | 20.0 | 20.0 | 20.0 |
| 220,000 | 500,000 | 39.8 | 20.0 | 20.0 | 20.0 | 20.0 |

## 1.1 Salary

All FA/PWAs will receive a guaranteed monthly salary. Total compensation in any month will not be lower than their applicable monthly salary.

The salary for each FA/PWA is determined by the state in which the FA/PWA is employed. The table below summarizes the current FA/PWA salaries by state. However, the salaries are subject to adjustment throughout the year at Morgan Stanley Wealth Management's sole discretion, including changes based on applicable state law.

Monthly Salary by State

| State | FA/PWA Salary ($) |
|---|---|
| Alaska | 3,034 |
| California | 3,120 |
| Connecticut | 2,059 |
| Hawaii | 2,000 |
| New York | 2,844 |
| All Other | 1,972 |

---

[1] Chart reflects potential income or estimates and is not intended to reflect a guarantee of any level of remuneration or income
[2] Assumes FA/PWA was hired before January 1st, 2013, is not part of a Financial Advisor Associate (FAA) program, did not end 2015 with a 20% Credit Rate, and opened six new Lending Units (PLA (excluding Letters of Credit), ECL, Tailored Lending, Mortgage (excluding HELOC)) in 2015 at the pre-split level

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

## 1.2 Incentive Compensation

### 1.2.1 Total Credits

Subject to the terms outlined in this Program, an FA/PWA is allocated Total Credits based on his/her Credit Rate and Creditable Revenue. Each FA/PWA's Credit Rate is based on two factors: (1) full year Gross Revenue and (2) Length of Service ("LOS"), as shown in the Credit Rate Schedule below.

Credit Rate Schedule (%)

| Annual Gross Revenue ($) | Length of Service (years) | | | | | | |
|---|---|---|---|---|---|---|---|
| | 0 - 4.9 | 5 - 6.9 | 7 - 8.9 | 9 - 14.9 | 15 - 19.9 | 20 - 24.9 | 25+ |
| 5,000,000+ | 51.5% | 52.0% | 53.5% | 54.0% | 54.5% | 55.0% | 55.5% |
| 3,000,000–4,999,999 | 49.0 | 49.5 | 51.0 | 51.5 | 52.0 | 52.5 | 53.0 |
| 2,500,000–2,999,999 | 48.0 | 48.5 | 50.0 | 50.5 | 51.0 | 51.5 | 52.0 |
| 2,200,000–2,499,999 | 47.0 | 47.5 | 49.0 | 49.5 | 50.0 | 50.5 | 50.5 |
| 1,650,000–2,199,999 | 46.5 | 47.0 | 48.5 | 49.0 | 49.5 | 49.5 | 49.5 |
| 1,100,000–1,649,999 | 45.5 | 46.0 | 47.5 | 48.0 | 48.0 | 48.0 | 48.0 |
| 880,000–1,099,999 | 43.0 | 43.5 | 45.0 | 45.0 | 45.0 | 45.0 | 45.0 |
| 825,000–879,999 | 42.5 | 43.0 | 44.5 | 44.5 | 44.5 | 44.5 | 44.5 |
| 660,000–824,999 | 42.0 | 42.5 | 44.0 | 44.0 | 44.0 | 44.0 | 44.0 |
| 550,000–659,999 | 41.0 | 41.5 | 43.0 | 43.0 | 43.0 | 43.0 | 43.0 |
| 440,000–549,999 | 41.0 | 41.5 | 41.5 | 41.5 | 41.5 | 41.5 | 41.5 |
| 385,000–439,999 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 | 38.0 |
| 330,000–384,999 | 36.0 | 36.0 | 36.0 | 36.0 | 36.0 | 36.0 | 36.0 |
| 275,000–329,999 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 |
| 220,000–274,999 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 | 32.0 |
| 0–219,999 | 28.0 | 28.0 | 28.0 | 28.0 | 28.0 | 28.0 | 28.0 |

FA/PWAs Registered for Less Than Five Years

| Annual Gross Revenue ($) | For All Length of Service |
|---|---|
| 275,000–329,999 | 36.0% |
| 220,000–274,999 | 35.0 |
| 0–219,999 | 34.0 |

FA/PWAs Registered for Nine or More Years

| Annual Gross Revenue ($) | For All Length of Service |
|---|---|
| 0–299,999 | 20.0% |

As the FA/PWA reaches a new Gross Revenue band in the Credit Rate Schedule, provided the FA/PWA did not change LOS bands, then the Total Credits earned for the current month in addition to each prior month in the current calendar year will be retroactively adjusted to apply the Credit Rate of the newly attained Gross Revenue band to the FA/PWA's year-to-date Total Credits.

If the FA/PWA reaches a new LOS band in the Credit Rate Schedule and remains in the same Gross Revenue band for the remainder of the year, then the newly attained Credit Rate will be applied to Gross Revenue generated in the month following that in which the LOS breakpoint was crossed, as well as prospectively. However, the Credit Rate will <u>NOT</u> be adjusted retroactively to bring the FA/PWA's year-to-date Total Credits to the newly-attained level.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

If the FA/PWA reaches a new LOS band in the Credit Rate Schedule and subsequently reaches a new Gross Revenue band during the same year, then year-to-date Total Credits will be retroactively adjusted to:

- Apply the Credit Rate of the newly-attained Gross Revenue band and previous LOS band to the Total Credits earned while in the previous LOS band; and

- Apply the Credit Rate of the newly-attained Gross Revenue band and new LOS band to the Total Credits earned while in the new LOS band

Retroactive Credit Rate Adjustments will only apply to Grid Revenue (not Flat-Rate Revenue or 0% Revenue).

$$\text{Total Credits} = \text{Cash Credits} + \text{Deferred Credits}$$

### 1.2.2 Deferred Compensation

A percentage of Total Credits are allocated to the FA/PWA as Deferred Credits based on a Deferral Ratio determined by the FA/PWA's full year Gross Revenue, as shown in the Deferral Ratio Schedule below.

$$\text{Deferred Credits} = \text{Total Credits} \times \text{Deferral Ratio}$$

Deferral Ratio Schedule

| Annual Gross Revenue ($) | Deferral Ratio (%) |
|---|---|
| 5,000,000+ | 15.5 |
| 3,000,000–4,999,999 | 14.0 |
| 2,500,000–2,999,999 | 13.0 |
| 2,200,000–2,499,999 | 12.5 |
| 1,650,000–2,199,999 | 11.5 |
| 1,100,000–1,649,999 | 10.0 |
| 880,000–1,099,999 | 8.5 |
| 825,000–879,999 | 7.5 |
| 660,000–824,999 | 6.5 |
| 550,000–659,999 | 5.5 |
| 440,000–549,999 | 5.0 |
| 385,000–439,999 | 4.0 |
| 330,000–384,999 | 3.5 |
| 275,000–329,999 | 2.5 |
| 220,000–274,999 | 1.5 |
| 0–219,999 | 1.5 |

FA/PWAs with a Credit Rate equal to 20% will have a Deferral Ratio of 0%.

As the FA/PWA reaches a new Gross Revenue threshold in the Deferral Ratio Schedule during the year, the Deferral Ratio for each prior month, in addition to the current month, will be retroactively adjusted to bring the FA/PWA's total year-to-date Deferred Credits to the newly-attained level.

The value of the Deferred Credits for 2015 will not be paid to the FA/PWA in cash on a current basis, but will instead be awarded as deferred compensation shortly following year-end (provided the FA/PWA is employed on the grant date). Deferred Compensation will be awarded 25% in the form of an equity-based award that is scheduled to convert to shares during year 4 and 75% in the form of a cash-based award that is scheduled to be paid during year 8. The remaining terms and conditions of the deferred compensation awards, including vesting, cancellation provisions and sales restrictions, will be determined by the Compensation, Management Development and Succession Committee of Morgan Stanley's Board of Directors (the "Compensation Committee") on or prior to the grant date and will be set forth in the

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

applicable award documentation. Deferred compensation awards are contingent upon the FA/PWA remaining employed through the grant and vesting dates of the award.

In the event that the FA/PWA's full-year 2015 Deferred Credit withholding is less than the year-end calculated Deferred Credit amount (defined as the FA/PWA's full-year 2015 Total Credits multiplied by the FA/PWA's year-end 2015 Deferral Ratio), the Firm will award the year-end calculated Deferred Credit amount as a deferred compensation award. The difference between the FA/PWA's year-end calculated Deferred Credit amount and the FA/PWA's full-year 2015 Deferred Credit withholding will be repaid to the Firm by the FA/PWA through a decrease in the FA/PWA's 2016 Cash Credit amount. The Firm reserves the right to make adjustments to the amounts withheld during the year pursuant to an FA/PWA's Deferral Ratio, provided that in all cases the amount of the deferred compensation award will equal the year-end Deferred Credit amount.

If an FA/PWA's Deferred Credits are equal to or less than $1,000, the Deferred Credits will be paid in cash on the date 2015 year-end bonuses are paid to Firm employees generally, but in no event later than March 15th, 2016, and will not be granted as a deferred compensation award.

Deferred compensation awards are not intended to provide for retirement income.

Associates/FAAs are not eligible to receive year-end deferred compensation awards.

### 1.2.3 Cash Compensation

The Total Credits remaining after Deferred Credits are allocated are then awarded to the FA/PWA as Cash Credits. An FA/PWA's Cash Credits are calculated monthly.

**Cash Credits** = Total Credits − Deferred Credits (including Retroactive Deferred Credit Adjustments)

**Example:**

An FA/PWA with a Length of Service (LOS) of 15 years produces $700,000 in Gross Revenue in 2015.

- Credit Rate is 44%
- Total Credits is $308,000  [$700,000 × 44.0%]
- Deferred Credits is $20,020  [$308,000 × 6.5%]
- Cash Credits is $287,980  [$308,000 − $20,020]

### Calculation of Cash Credit Advance

Cash Credit advance is the amount by which Cash Credits exceed FA/PWA salary for the month. An FA/PWA whose Cash Credits do not exceed his/her salary is not eligible to receive a Cash Credit advance. An FA/PWA's Cash Credit advance is calculated monthly and is paid, in arrears, on a monthly basis. Cash Credit advance is calculated based on the following:

1) <u>Creditable Revenue</u> – Creditable Revenue is the Gross Revenue attributable to the FA/PWA that is in excess of his/her Revenue Share

2) <u>Revenue Share</u> – Creditable Revenue that is allocated to Support Staff through Revenue Share arrangements

3) <u>Grid Revenue</u> – Grid Revenue is revenue where Credits are determined based on the Credit Rate Schedule including revenue subject to the Discounting Policy. Grid Revenue does not include Flat-Rate Revenue where Credits are determined based on a flat Credit Rate or 0% Revenue where Credits are determined based on a 0% Credit Rate

4) <u>Credits</u> – FA/PWAs are allocated Credits based on the Credit Rate Schedule (Section 1.2.1) and Credit Rate Schedule Exceptions (Section 1.2.6)

5) <u>Retroactive Credit Rate Adjustments</u> – Credits are adjusted upwards or downwards to reflect Retroactive Credit Rate Adjustments based on movements along the Credit Rate Schedule

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

6) <u>Credit Adjustments</u> – Credits are adjusted upwards or downwards to reflect Incentive Compensation for which the FA/PWA did not receive proper Credits, or for which the FA/PWA received prior Credits that he/she should not have received. Under no circumstances is an FA/PWA to be allocated Credits or maintain Credits for transactions that were cancelled, that did not close, that were reversed, and/or where the FA/PWA was allocated Credits in error

7) <u>Total Credits</u> – Total Credits are the result of the Credits, Retroactive Credit Rate Adjustments, and Credit Adjustments as described in items 4, 5 and 6 above

8) <u>Deferred Credits</u> – Deferred Credits are Total Credits multiplied by the FA/PWA's Deferral Ratio as defined in Section 1.2.2

9) <u>Retroactive Deferred Credit Adjustments</u> – Deferred Credits are adjusted upwards or downwards to reflect Retroactive Deferred Credit Adjustments based on movements along the Deferral Ratio Schedule

10) <u>Length of Service ("LOS")</u> – LOS represents the amount of time an FA/PWA has been employed by Morgan Stanley Wealth Management plus the amount of time the FA/PWA was employed by legacy Morgan Stanley or legacy Smith Barney immediately preceding his or her employment with Morgan Stanley Wealth Management. LOS will not include any period of employment preceding employment at the immediately prior legacy firm, including prior employment at Morgan Stanley or Smith Barney. LOS for all purposes related to FA/PWA Compensation shall be defined exclusively as set forth in this paragraph and without reference to any other LOS definition that the firm may apply in other contexts, including, for example, for purposes of certain benefits calculations

11) <u>Length of Experience ("LOE")</u> – LOE represents the amount of time an FA/PWA has been a Registered Representative in the industry

Under no circumstances shall an FA/PWA be eligible to receive any Incentive Compensation under this Program unless and until the Incentive Compensation calculation is made and the FA/PWA meets all other conditions for receipt of such Incentive Compensation as determined by Morgan Stanley Wealth Management. In the event an FA/PWA who has been advanced Incentive Compensation because of fees that were charged to a customer in advance terminates, the FA/PWA's allocated Total Credits in the final month of employment will be adjusted to account for the unearned portion of the Cash Credit advance. In addition, an FA/PWA is obligated to repay Morgan Stanley Wealth Management any outstanding advanced but unearned Incentive Compensation after termination.

Morgan Stanley Wealth Management expects its FA/PWAs to demonstrate excellent guardianship at all times, including demonstrating the utmost professionalism and upholding the highest ethical and regulatory standards and its Incentive Compensation programs are premised on that expectation. Accordingly, Morgan Stanley Wealth Management reserves the right, on notice to the impacted individual, to make prospective downward adjustments to an individual FA/PWA's Credit Rate, or to make other downward adjustments as part of the calculation of Incentive Compensation at any time, where, in its sole judgment, such an adjustment is warranted based on the FA/PWA's conduct. The determination as to whether a downward adjustment is warranted on account of guardianship issues will be made by Morgan Stanley Wealth Management in its sole discretion, but may include, for example, significant trade errors, excessive customer complaints, regulatory or ethical lapses, or other conduct that is determined to be contrary to the best interests of the clients or the Firm.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

### 1.2.4 Team Compensation

In 2015, the Firm will continue to provide the opportunity for eligible FA/PWA Team members to receive an increased Credit Rate based on the Individual Eligibility or Team Eligibility Criteria below.

### Individual Eligibility

To be considered for Team Compensation, FA/PWAs must meet the following eligibility criteria:

- Must be on a Registered Team
  - A Registered Team is considered a collection of shared revenue relationships (Joint Production Numbers) through which <u>each member of the relationship generated at least 50% of their individual T-12 Gross Revenue</u> and for which a formal Joint Production Agreement (JPA) has been completed and approved
- Generate T-12 Gross Revenue at or above the 50th percentile by Industry Length of Experience (LOE) thresholds[3] as published on the 2015 FA/PWA Compensation website
- Generate at least 10% of the Team's total T-12 Gross Revenue <u>OR</u> if the Team's Total T-12 Gross Revenue is more than $3,000,000, each FA/PWA must generate at least 5% of the Team's Total T-12 Gross Revenue

### Team Eligibility

The Team as a whole can also qualify for Team Compensation. To be considered for Team Eligibility, the Team must meet the following eligibility criteria:

- Must be a Registered Team
- Team's total T-12 Gross Revenue must be at least $2,500,000 <u>AND</u> the average Gross Revenue per FA/PWA on the Team must be greater than $750,000
- There is no 50th percentile or percent of Team Gross Revenue requirement

FA/PWAs eligible for Team Compensation will receive the Credit Rate that corresponds to:

- The Gross Revenue band of the FA/PWA on the Team with the highest Gross Revenue; <u>AND</u>
- The lower LOS band between (i) the FA/PWA on the Team with the highest Gross Revenue and (ii) the FA/PWA eligible for Team Compensation

Eligible FA/PWAs will receive the Deferral Ratio that corresponds to the Gross Revenue band of the FA/PWA on the Team with the highest Gross Revenue.

An FA/PWA's individual Credit Rate cannot be reduced because of Team Compensation nor can it be greater than the Credit Rate of the FA/PWA on the Team with the highest Gross Revenue.

FA/PWAs who do not meet year-end qualifications but whose T-12 Gross Revenue meets the Team Compensation requirements any time during 2015 will be eligible for Team Compensation beginning the month following their qualification. Where that occurs, Team Compensation will be available prospectively through the end of the year (provided that the Team continues to satisfy the Registered Team requirements identified above), but will <u>NOT</u> be awarded retroactively. Once an FA/PWA qualifies, he/she will continue to receive Team Compensation throughout the year as long as the FA/PWA's Team continues to satisfy the Registered Team requirements.

FA/PWAs on Teams that dissolve or who leave the Team will no longer be eligible to receive Team Compensation and will revert to their own Credit Rate for the remainder of the year; prior Team Compensation allocated will not be adjusted retroactively.

### Recruits

Recruits will be treated in the same manner as an established FA/PWA by comparing the T-12 Gross Revenue listed on their recruit paperwork against the 50th percentile requirements.

---

[3] FA/PWA with the highest Gross Revenue on the Team must also generate T-12 Gross Revenue at or above the 50th percentile threshold by LOE band

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

## Associates/FAAs

Associates/FAAs are not eligible for Team Compensation while still part of the Associate/FAA program.

**Example 1:**

The following FA/PWAs are on a Registered Team for all of 2015 and met their respective top 50th percentile by LOE threshold as of January 1st 2015:

- FA/PWA 1 produces $1,500,000 of Gross Revenue, has LOS of 20 years, a Credit Rate of 48.0%, and a Deferral Ratio of 10.0%
- FA/PWA 2 produces $400,000 of Gross Revenue, has LOS of 4 years, a Credit Rate of 38.0% and a Deferral Ratio of 4.0%

FA/PWA 2's Credit Rate will be determined using FA/PWA 1's Gross Revenue band and FA/PWA 2's LOS band. FA/PWA 2's Credit Rate will be 45.5% and Deferral Ratio will be 10.0%.

**Example 2:**

The following FA/PWAs are on a Registered Team for all of 2015 and met their respective top 50th percentile by LOE threshold as of January 1st 2015:

- FA/PWA 1 produces $1,200,000 of Gross Revenue, has LOS of 5 years, a Credit Rate of 46.0%, and a Deferral Ratio of 10.0%
- FA/PWA 2 produces $500,000 of Gross Revenue, has LOS of 7 years, a Credit Rate of 41.5% and a Deferral Ratio of 5.0%

FA/PWA 2's Credit Rate will be determined using FA/PWA 1's Gross Revenue band and FA/PWA 1's LOS band. FA/PWA 2's Credit Rate will be 46.0% and Deferral Ratio will be 10.0%

## 1.2.5 Start-Up Policy and Reset

At the start of each year, all FA/PWAs are assigned an advanced Credit Rate and Deferral Ratio.

### Advanced Credit Rate and Deferral Ratio

Advanced Credit Rates and Deferral Ratios are assigned as follows:

- FA/PWAs with prior year Gross Revenue of $1,100,000 or more are assigned an advanced Credit Rate and Deferral Ratio based on their 2014 Gross Revenue, December 2014 LOS and the 2015 Credit Rate and Deferral Ratio Schedules
- FA/PWAs with prior year Gross Revenue of less than $1,100,000 are assigned an advanced Credit Rate and Deferral Ratio based on their 2014 Gross Revenue and December 2014 LOS at one Gross Revenue band lower on the 2015 Credit Rate and Deferral Ratio Schedules, but not less than the lowest Gross Revenue band on the applicable Credit Rate or Deferral Ratio Schedules

*Please note that the advanced Credit Rate under this Start-Up Policy is an advance against FA/PWA Incentive Compensation.*

In July and October, if the Credit Rate corresponding to the FA/PWA's 2015 annualized Gross Revenue ("target rate") is less than the advanced Credit Rate assigned to the FA/PWA at the start of the year ("start-up rate"), then the Credit Rate and Deferral Ratio will be reset to one Gross Revenue band below the target rate as determined by the 2015 Credit Rate and Deferral Ratio Schedules. If the target rate is equal to or greater than the start-up rate, the advanced Credit Rate and Deferral Ratio will remain unchanged.

If the advanced Incentive Compensation amount exceeds the Incentive Compensation calculated under the terms of this Program, the difference will be subtracted from the FA/PWA's allocated Cash Credits in the last month of the year and any shortfall will be carried forward into the next year. If the advanced Deferred Credits exceed the Deferred Credits calculated under the terms of this Program, the difference will be added to the FA/PWA's allocated Cash Credits in the last month of the year.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

In the event the FA/PWA's employment terminates, the Credit Rate and Deferral Ratio will be retroactively adjusted based on the year-to-date Gross Revenue and the 2015 Credit Rate and Deferral Ratio Schedules. If the advanced Incentive Compensation amount exceeds the calculated Incentive Compensation under the terms of this Program, the difference will be subtracted from the FA/PWA's allocated Cash Credits in the final month of employment so that the FA/PWA will be paid in full based on the actual applicable Credit Rate for the year. In addition, an FA/PWA whose employment terminates is obligated to repay Morgan Stanley Wealth Management any outstanding advanced but unearned Incentive Compensation.

### 1.2.6 Credit Rate Schedule Exceptions

### Equity and Options Discounting

In situations where an FA/PWA exercises discretion to offer a discount to the client, the FA/PWA's Credit Rate will be reduced as per the tables below, subject to a minimum 10% Credit Rate. Cents-per-share trades will be converted to a percentage discount to determine application of the tables below:

Summary Table

| Pricing | Credit |
|---|---|
| Discount of 0% up to 20% | Credit Rate |
| Discount over 20% and up to 30% | Credit Rate minus 25bps per 1% of Discount over 20% |
| Discount over 30% and up to 45% | Credit Rate minus 40bps per 1% of Discount over 30% |
| Discount greater than 45% | Credit Rate minus 60bps per 1% of Discount over 45% |

Below is a detailed table showing the exact impact to Credit Rate based on the level of discount. All numbers shown are percentages:

Detailed Table

| Level of Discount | Credit Rate Reduction | Level of Discount | Credit Rate Reduction | Level of Discount | Credit Rate Reduction | Level of Discount | Credit Rate Reduction |
|---|---|---|---|---|---|---|---|
| 0 – 20% | 0.00% | 40% | 6.50% | 60% | 17.50% | 80% | 29.50% |
| 21 | 0.25 | 41 | 6.90 | 61 | 18.10 | 81 | 30.10 |
| 22 | 0.50 | 42 | 7.30 | 62 | 18.70 | 82 | 30.70 |
| 23 | 0.75 | 43 | 7.70 | 63 | 19.30 | 83 | 31.30 |
| 24 | 1.00 | 44 | 8.10 | 64 | 19.90 | 84 | 31.90 |
| 25 | 1.25 | 45 | 8.50 | 65 | 20.50 | 85 | 32.50 |
| 26 | 1.50 | 46 | 9.10 | 66 | 21.10 | 86 | 33.10 |
| 27 | 1.75 | 47 | 9.70 | 67 | 21.70 | 87 | 33.70 |
| 28 | 2.00 | 48 | 10.30 | 68 | 22.30 | 88 | 34.30 |
| 29 | 2.25 | 49 | 10.90 | 69 | 22.90 | 89 | 34.90 |
| 30 | 2.50 | 50 | 11.50 | 70 | 23.50 | 90 | 35.50 |
| 31 | 2.90 | 51 | 12.10 | 71 | 24.10 | 91 | 36.10 |
| 32 | 3.30 | 52 | 12.70 | 72 | 24.70 | 92 | 36.70 |
| 33 | 3.70 | 53 | 13.30 | 73 | 25.30 | 93 | 37.30 |
| 34 | 4.10 | 54 | 13.90 | 74 | 25.90 | 94 | 37.90 |
| 35 | 4.50 | 55 | 14.50 | 75 | 26.50 | 95 | 38.50 |
| 36 | 4.90 | 56 | 15.10 | 76 | 27.10 | 96 | 39.10 |
| 37 | 5.30 | 57 | 15.70 | 77 | 27.70 | 97 | 39.70 |
| 38 | 5.70 | 58 | 16.30 | 78 | 28.30 | 98 | 40.30 |
| 39 | 6.10 | 59 | 16.90 | 79 | 28.90 | 99 | 40.90 |

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

**Example 1: Transaction with a commission charged to client of less than $350:**

An FA/PWA with a Credit Rate (based on Credit Rate Schedule) of 36% executes a trade with a commission of $400:

1) FA/PWA discounts this trade by 40% = commission of $240 [$400 – ($400 * 40%) = $240]
2) As seen in the Detailed Table above, the Credit Rate reduction on this trade is 6.5%
3) Credit rate on this trade is 29.5% [36% - 6.5% = 29.5%]
4) FA/PWA Total Credit is $70.80 [$240 * 29.5% = $70.80]

**Example 2: Transaction with a commission charged to client of less than $350 - 10% minimum Credit Rate:**

An FA/PWA with a Credit Rate (based on Credit Rate Schedule) of 36% executes a trade with a commission of $600:

1) FA/PWA discounts this trade by 80% = commission of $120 [$600 – ($600 * 80%) = $120]
2) As seen in the Detailed Table above, the Credit Rate reduction on this trade is 29.5%
3) Calculated Credit rate on this trade is 6.5% [36% - 29.5% = 6.5%] however, applicable Credit rate will be 10% due to minimum Credit Rate
4) FA/PWA Total Credit is $12 [$120 * 10% = $12]

The Equity and Options Discounting Policy shall not apply to the following:

| Discount Exceptions |
| --- |
| Employee Accounts |
| Employee-Related Accounts |
| Futures (the below Futures Discount Sharing policy applies) |
| Ladder Portfolios—All one-ticket, preplanned ladders in order-entry inventory |
| SOP Accounts / CSX Accounts / DSB Accounts |
| Strategic Equity Portfolio ("STEP") |
| CES-directed Brokerage |
| Flat-rate accounts are credited at lower of Credit Rate or flat-rate |
| Equity Transactions with commission amount of $350 or more (exemption does not apply to commissions priced at an effective rate of <4 cents per share) |
| Options Transactions with commission amount of $350 or more (exemption does not apply to commissions priced at less than $3.00 for contracts with premiums ≥1.00 or to commissions priced at less than $1.00 for contracts with premiums <$1.00) |

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

### Futures and Commodities Discounting

In situations where the FA/PWA exercises discretion to offer a discount to the client, the FA/PWA's Credit Rate will be reduced as per the tables below, subject to a minimum 10% Credit Rate.

Summary Table

| Commission Per Half-Turn Contract | Credit |
|---|---|
| Above and equal to $18.00 | Credit Rate |
| Less than $18.00 | Credit Rate minus 1% for each dollar, or portion of dollar, of commission per half-turn under $18.00 |

Below is a detailed table showing the exact impact to Credit allocation based on level of discount:

Detailed Table

| Commission Per Half-Turn Contract | Credit Rate Reduction | Commission Per Half-Turn Contract | Credit Rate Reduction |
|---|---|---|---|
| $17.00 to $17.99 | 1.0% | $8.00 to $8.99 | 10.0% |
| $16.00 to $16.99 | 2.0% | $7.00 to $7.99 | 11.0% |
| $15.00 to $15.99 | 3.0% | $6.00 to $6.99 | 12.0% |
| $14.00 to $14.99 | 4.0% | $5.00 to $5.99 | 13.0% |
| $13.00 to $13.99 | 5.0% | $4.00 to $4.99 | 14.0% |
| $12.00 to $12.99 | 6.0% | $3.00 to $3.99 | 15.0% |
| $11.00 to $11.99 | 7.0% | $2.00 to $2.99 | 16.0% |
| $10.00 to $10.99 | 8.0% | $1.00 to $1.99 | 17.0% |
| $9.00 to $9.99 | 9.0% | | |

Discounting below $1.00 per Half-Turn Contract is only allowed with prior approval from Capital Markets, and will result in a 17.0% Credit Rate reduction.

**Example:**

If an FA/PWA with a Credit Rate of 36% executes 10 Futures or Commodities contracts with half-turn commission of $10.25 per contract, the Credit Rate on this trade would be 28% [36.0% - 8.0% = 28.0%] and the FA/PWA's Total Credit would be $28.70 [$10.25 *10 * 28.0% = $28.70].

The Futures and Commodities Discounting policy shall not apply to tickets of $350 or more where the half turn is $5.00 or greater.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

## Small Households

Any Household with asset levels less than the below mentioned thresholds for four consecutive months is considered a Small Household. Asset levels are calculated each month on the last trade date using the higher of: (a) the previous three months asset balance; or (b) the asset balance on the day prior to last trade date. Credit allocation for Consulting Group Revenue generated in Small Households will be based on the tables below:

Financial Advisor – Small Households Schedule

| Product | Household Asset Level ($) | Credit (%) |
|---|---|---|
| Consulting Group Products[4] | 75,000–99,999 | 20 |
| | 50,000–74,999 | 15 |
| | 0–49,999 | 10 |
| All Other Products | 0–99,999 | 0 |

From January 1st, 2015 to March 31st, 2015, Private Wealth Advisors ("PWAs") will be subject to the FA Small Households policy. Effective April 1st, 2015, Credit allocation for PWAs will be based on the PWA Small Households policy rules in the table below for Households where 50.01% or greater of the aggregate split of a FA number or Joint Production Number ("JPN") is credited to PWAs <u>AND</u> all of the accounts within the Household were opened on or after April 1st, 2015. Households with at least one account opened before April 1st, 2015 will be subject to the FA Small Households policy rules in the table above. Households with assets less than $100,000, regardless of the aggregate split of the JPN that is credited to PWAs, will be subject to the FA Small Households policy rules in the table above.

Private Wealth Advisor – Small Households Schedule

| Product | Household Asset Level ($) | Credit (%) |
|---|---|---|
| Consulting Group Products[4] | 100,000–1,999,999 | 20 |
| All Other Products | 100,000–1,999,999 | 0 |

Credit allocation for Non-Resident Client ("NRC") accounts will be based on the NRC Account Small Household policy rules in the table below. NRC accounts in Households with assets less than $100,000 will be subject to the FA Small Households policy rules in the table above:

Non-Resident Client Accounts – Small Households Schedule

| Product | Household Asset Level ($) | Credit (%) |
|---|---|---|
| Consulting Group Products[4] | 100,000–499,999 | 20 |
| All Other Products | 100,000–499,999 | 0 |

Revenue from products other than Consulting Group Products will receive Gross Revenue but no Credit.

---

[4] Consulting Group Products include: Fiduciary Services (FS), Consulting & Evaluation Services (CES), Investment Management Services (IMS), Select UMA, TRAK Fund Solution, TRAK CGCM, Portfolio Management, Consulting Group Advisor, Global Investment Solutions (GIS)

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

The Small Households Policy shall not apply to the following:

| Small Households Exceptions |
| --- |
| Annuities |
| College Savings External 529 Plans |
| Delivery Versus Payment ("DVP") Accounts |
| Employee Benefits Trusts |
| Financial Planning Fees |
| Futures |
| Insurance |
| New Households (opened within previous 6 months) |
| Retirement Plan Trusts |
| SAR-SEP IRA accounts, SEP IRAs, SIMPLE Accounts, Simple IRAs, VIP/RPM Accounts |
| SOP Accounts / CSX Accounts / DSB Accounts |
| Consulting Group Non-Custody Accounts |
| First State Trust Company Accounts (Product Codes 532 and 533) |
| Households served by FAs (≥50.00% of the aggregate JPN split is credited to FAs) enrolled in OneView with greater than $250,000 in combined (external OneView + Morgan Stanley) assets [see OneView exemption section below] |
| Households served by PWAs (≥50.01% of the aggregate JPN split is credited to PWAs) enrolled in OneView with greater than $10,000,000 in combined (external OneView + Morgan Stanley) assets |

## OneView Exemption on Small Households Policy[5]

Any Gross Revenue from a client Household that is enrolled in OneView is eligible for exemption from the Small Households Policy provided that it meets the below criteria. This exemption eligibility from the Small Households Policy will apply for two years from the first day of the month following the date of the client's enrollment in OneView, regardless of the initial combined asset level in the Household or whether any transactions have occurred at the time of enrollment. At the end of two years, only assets held at Morgan Stanley will be considered, in accordance with the terms of the Small Households Policy in effect at that time.

Gross Revenue from Households enrolled in OneView that have less than $100,000 in Morgan Stanley assets but a underlined combined asset level (external OneView assets[6] + Morgan Stanley assets) of greater than $250,000 for FAs ($10,000,000 for PWAs) will be exempt from the Small Households Policy.

If a Household enrolled in OneView (served ≥50% by FA(s)) has a combined asset level (external OneView assets + Morgan Stanley assets[5]) of greater than $250,000, but subsequently falls below the $250,000 threshold for four consecutive months, the Household will be subjected to the Small Households Policy until its combined asset level becomes greater than $250,000 again. The exemption eligibility period will remain as two years from the client's initial enrollment in OneView (i.e. the exemption eligibility period will not restart based on changes in the combined asset level).

For example, in February 2015 a client enrolls in OneView for the first time, with a total of $90,000 in Morgan Stanley assets and $200,000 in OneView assets. Starting with February month-end processing, the Household (which is served ≥50% by FA(s)) is eligible for exemption from the Small Households Policy. The two-year eligibility exemption period will begin March 2015 and last through the end of February 2017.

## Small Household Transfers to the Client Advisory Center before January 1st, 2015

For Small Households transferred to the Client Advisory Center ("CAC") in 2014, FA/PWAs will continue to receive credit in the form of Phantom Gross Revenue for the revenue generated in the 12 months following the date the account was transferred to the CAC. Phantom Gross Revenue will only be used to determine Club Memberships, Titles, and Expense Allowances.

---

[5] Morgan Stanley reserves the right to modify or terminate this exemption at any time, in its discretion, and apply such modification or termination immediately to affected households
[6] Does not include manual entries – the account types included in Morgan Stanley assets are considered for OneView external assets

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

### Household Transfers & New Account Referrals to the CAC on or after January 1st, 2015

For existing Households transferred to the CAC after January 1st, 2015, as well as for new Households referred directly to the CAC after January 1st, 2015, FA/PWAs will receive a one-time Gross Revenue credit equal to 50 bps of the Household AUM, up to $250,000 of AUM. Household AUM will be evaluated at the end of the third month after the CAC receives the Household. The following Credit Rates will apply:

CAC Transfer & Referral Credit Rate Schedule

| Household AUM[7] | Credit Rate |
|---|---|
| <$100,000 | 20% |
| $100,000+ | Standard Credit Rate |

### Low-Priced Securities

FA/PWAs will not be allocated Credits on securities priced at $0.99 or less per share.

### Small Trades

Credit allocation for Small Trades will be based on the table below:

Small Trades Credit Rate Schedule

| Product | Transaction Amount ($) | Credit Rate (%) |
|---|---|---|
| Options[8] | 75.00–99.99 | 30 |
| | 50.00–74.99 | 20 |
| | 0–49.99 | 0 |
| All Other Products | 0–99.99 | 0 |

The Small Trades policy shall not apply to the following:

| Small Trades Exceptions |
|---|
| Annuities |
| Certificates of Deposit |
| Choice Select Program |
| College Savings External 529 Plans |
| Consulting Group Advisory[9] |
| Corporate Retirement Plan Products (Held-away) |
| Equity and Fixed Income Underwriting |
| Futures |
| Insurance |
| Ladder Portfolios—All one-ticket, preplanned ladders in order-entry inventory |
| Managed Futures |
| Mutual Funds |
| Options - Opening covered sell orders, regardless of size |
| Repurchase Agreements |
| SOP Accounts / CSX Accounts / DSB Accounts |
| Strategic Equity Portfolio ("STEP") |
| Treasury Bills |
| Unit Trusts |
| Vision-Directed Brokerage |
| Fixed Income Products[10] |
| For accounts on Flat-Rate Credit, FA/PWAs are credited the lesser of the assigned Flat-Rate or Small Ticket Rate |

---

[7] Household AUM will be evaluated at the end of the third month after the CAC receives the Household.
[8] Excludes exercise and assignments
[9] Consulting Group Products include: Fiduciary Services (FS), Consulting & Evaluation Services (CES), Investment Management Services (IMS), Select UMA, TRAK Fund Solution, TRAK CGCM, Portfolio Management, Consulting Group Advisor, Global Investment Solutions (GIS)
[10] All Global Currency Deposits are subject to the small trade policy

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

## Fixed Income DVP Credit Rate

FA/PWAs are allocated Credits based on a fixed percentage on all Fixed Income business generated in DVP accounts. The Credit Rate is based on the total prior year Gross Revenue, as follows:

Credit Rate Summary

| Prior Year Gross Revenue ($) | Credit Rate (%) |
|---|---|
| 500,000 and over | 35 |
| 0–499,999 | 25 |

This Fixed Income DVP Policy shall not apply to CES-Directed Brokerage.

## Equity Syndicate

For Households where 70% or more of T-12 Gross Revenue is generated from Equity Syndicate business, FA/PWAs will receive a flat 20% Credit Rate on Equity Syndicate revenue. For Households where less than 70% of T-12 Gross Revenue comes from Equity Syndicate business, Equity Syndicate Gross Revenue will be credited at the standard Credit Rate (see Section 1.2.1) and all other Credit Rate Schedule exception policies will also apply.

The ratio of Equity Syndicate Gross Revenue to total Gross Revenue from a specific Household is calculated on a rolling 12 month basis at the end of each month. For example, if a Household generates $10,000 in T-12 Gross Revenue between May 2014 and April 2015, of which $8,000 is from Equity Syndicate business (80%), then any Equity Syndicate Gross Revenue from that Household for the month of April 2015 would be credited at a flat 20% Credit Rate. However, if at the end of the following month (May 2015) the same Household's T-12 Gross Revenue is $12,000, of which $8,000 is from Equity Syndicate business (~67%), all Equity Syndicate business will be credited at the standard Credit Rate for the month of May 2015 and all other Credit Rate Schedule exception policies will also apply; there will be no retroactive Credit back to April 2015.

"Equity Syndicate" business refers to equity syndicate IPOs, secondary offerings, follow-ons, and block trades. This policy does not affect selling concessions on structured investments, fixed income syndicate, preferred new issues, closed-end fund IPOs, or municipal syndicate offerings.

## Non-Resident Client Business

Non-Resident Client ("NRC") business includes all business done in accounts held by individuals or entities with a Non-U.S. legal address on the account (excluding SOP, CSX, and DSB accounts). For NRC accounts, there will be a 15% Credit Rate reduction for FA/PWAs who have less than $100,000 Gross Revenue in 2014 from NRC business (excluding SOP, CSX, and DSB accounts).

The 15% NRC Credit Rate reduction will not apply to any NRC accounts on JPNs between FA/PWA(s) and ICA(s), where the ICA(s) are receiving a minimum 50% split from that JPN.

In addition, if an FA/PWA exceeds $100,000 Gross Revenue from NRC business in 2015, then the 15% Credit Rate reduction will be credited back to the FA/PWA retroactive to January 1st, 2015.

For FA/PWAs receiving Team Compensation, the NRC Credit Rate reduction will be set according to the NRC Gross Revenue of the FA/PWA on the Team with the highest Gross Revenue. If the FA/PWA receiving Team Compensation has NRC Gross Revenue greater than $100,000, then his/her Credit Rate will not be reduced by 15% for NRC business.

This Non-Resident Client Policy shall not apply to SOP, CSX and DSB Accounts. The Equity and Options Discounting policy will apply.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 1: Compensation Programs**

**Example 1**:

An FA/PWA with $1,500,000 Gross Revenue in 2015, a LOS of 10 years, and $50,000 NRC Gross Revenue in 2014 will receive a Credit Rate of 33% (48% - 15%) on his/her NRC business; all other Credit Rate Schedule exception policies will also apply.

**Example 2**:

An FA/PWA with $1,500,000 Gross Revenue in 2015, a LOS of 10 years, and $50,000 NRC Gross Revenue in 2014, and partners with an ICA who receives a 50% split from that JPN, will receive a standard Credit Rate of 48% on his/her NRC business due to the ICA partnership, and all other Credit Rate Schedule exception policies will also apply.

**Example 3**:

An FA/PWA with $800,000 Gross Revenue in 2015 and $50,000 NRC Gross Revenue in 2014 is on a Registered Team with another FA/PWA who has $1,500,000 Gross Revenue in 2015 and $150,000 NRC Gross Revenue in 2014. The FA/PWA with $800,000 Gross Revenue will not receive a 15% Credit Rate reduction for the months that he/she is receiving Team Compensation.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 2: Growth Award**

## 2.1 Growth Award

### Award Structure

The 2015 Growth Award consists of the Growth Premium, 25% Additional Business Development Allowance ("BDA") in 2016, $2,000 CSA "Go for Growth" Award, and Lending Award.

FA/PWAs who meet either the Individual Eligibility Criteria OR the Team Eligibility Criteria for the Growth Premium listed below will be eligible to receive the Growth Premium as well as receive 25% Additional BDA in 2016 and a $2,000 CSA "Go for Growth" Award.

FA/PWAs who meet either the Individual Eligibility Criteria OR the Team Eligibility Criteria for the Lending Award listed below will be eligible to receive the Lending Award.

### Award Schedule

The Growth Award will be issued to FA/PWAs as a 5-year bonus agreement. The bonus agreement will have terms and conditions which will include requirements relating to ongoing employment in good standing and other material terms, including, but not limited to, a general release of all claims against the Firm, which will be set forth in the applicable documentation in detail. Any award under $10,000 (total of Growth Premium and Lending Award) will be paid as cash in the first quarter of 2016.

The 25% Additional BDA portion will be funded along with 2016 BDA and will be 25% of the 2015 BDA amount. The CSA "Go for Growth" Award will be funded in the CSA compensation system in the first quarter of 2016 and FA/PWAs will be able to allocate accordingly to a CSA(s).

In order to be eligible to receive any award, FA/PWAs must be employed in good standing as of the payment/funding date.

### Loan Eligibility

The FA/PWA may also be eligible for an upfront loan in the first quarter of 2016, which would be subject to the same terms and conditions, including requirements related to ongoing employment in good standing, as the Growth Award.

## 2.2 Growth Premium

The Morgan Stanley Wealth Management Growth Premium is designed to reward FA/PWAs who grow their business in 2015 with respect to 2014. The Growth Premium is calculated annually.

### Growth Premium – Individual Eligibility Criteria

- FA/PWAs must be hired before January 1st, 2013; AND
- Not be part of the Financial Advisor Associate (FAA) program; AND
- Rank within the Top 10% in Gross Revenue growth percentage by LOE band (growth must be positive) in 2015 with respect to 2014, OR have at least $300,000 in absolute Gross Revenue growth in 2015 with respect to 2014; AND
- Not end the 2015 year with a 20% Credit Rate

To calculate the FA/PWA's Gross Revenue growth percent, calendar year 2015 Gross Revenue will be compared to calendar year 2014 Gross Revenue. FA/PWAs will be grouped into the LOE bands listed below and ranked according to Gross Revenue growth percent. FA/PWAs who rank within the Top 10% at the end of 2015 (revenue growth must also be positive in 2015 with respect to 2014) will be considered for the Growth Premium if the above Eligibility Criteria is also met.

If an FA/PWA does not end the year within the Top 10% of his/her LOE band in terms of Gross Revenue growth percentage, but does have Gross Revenue growth of at least $300,000 over 2014 and has satisfied all other Individual Eligibility Criteria for the 2015 Growth Premium, then he/she will be considered eligible for the 2015 Growth Premium.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 2: Growth Award**

The following 2015 LOE groups will be used for ranking FA/PWAs' Gross Revenue growth percent: 1, 2, 3, 4, 5, 6, 7 & 8, 9 & 10, 11 through 14, 15 through 24, and 25+.

### Growth Premium – Team Eligibility Criteria

- FA/PWAs must be hired before January 1st, 2013; <u>AND</u>
- Not be part of the Financial Advisor Associate (FAA) program as of January 1st, 2015; <u>AND</u>
- On a Registered Team in the Team Registry as of January 1st, 2015; <u>AND</u>
- All eligible Team members must properly complete the Team Eligibility Criteria Opt-In Form which must be received by Home Office by the specified date at the time of communication, and in doing so waive their right to be evaluated on an individual basis for the 2015 Growth Premium and 2015 Lending Award; <u>AND</u>
- Aggregate Gross Revenue growth of all eligible FA/PWAs on the Registered Team at the end of 2015 exceeds the minimum Top 10% Gross Revenue growth percentage (aggregate growth must be positive) corresponding to the LOE band of the FA/PWA on the Registered Team with the highest 2015 Gross Revenue; <u>AND</u>
- No eligible FA/PWA on the Registered Team has transitioned to a non-producing role at Morgan Stanley at any time during 2015

To calculate the Team's aggregate Gross Revenue growth percent, the individual calendar year 2015 Gross Revenue of all eligible FA/PWA members on the Registered Team will be summed and compared to the sum of their individual calendar year 2014 Gross Revenue. In order to determine eligibility at the end of 2015, the Team's aggregate Gross Revenue growth percent will be measured against the minimum Top 10% Gross Revenue growth percent that corresponds to the LOE band of the FA/PWA on the Registered Team with the highest Gross Revenue in 2015. For Teams with aggregate Gross Revenue growth that rank within the Top 10%, all eligible FA/PWAs on the Team will receive the same Growth Premium payout percentage regardless of where they rank individually in terms of Gross Revenue growth.

In the event that the Registered Team does not qualify for the Growth Premium according to the Team Eligibility Criteria, but an eligible FA/PWA on the team has at least $300,000 in absolute Gross Revenue growth in 2015 over 2014 on an individual basis, then only that FA/PWA will be considered eligible for the 2015 Growth Premium. All other FA/PWAs of the Registered Team will not earn the 2015 Growth Premium, 25% Additional BDA in 2016, or CSA "Go for Growth" Award.

FA/PWAs who end the 2015 year with a 20% Credit Rate will be included in the Registered Team's aggregate metrics for qualification purposes, but will not be eligible to receive the 2015 Growth Premium, 25% Additional Business Development Allowance, or CSA "Go for Growth" Award.

The Firm reserves the right to monitor and review material revenue distribution changes within the Team and to make all decisions with regard to eligibility for and calculation of any award hereunder in order to effectuate the spirit and intent of this program, as determined by Morgan Stanley in its sole discretion.

For additional information about Team Eligibility Criteria including more examples, other requirements, and information about particular situations, see the 2015 Growth Award Team Eligibility Criteria section of the FAQ document on the 2015 FA/PWA Compensation website.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 2: Growth Award**

## Growth Premium Calculation

The Growth Premium is calculated on total Grid Revenue, which excludes Flat-Rate Revenue and Zero % Revenue. At year-end, FA/PWAs will be eligible for an award based on the below schedule:

Growth Premium

| Rank of Gross Revenue Growth Percentage within LOE Band OR Gross Revenue Growth | Award (%) |
|---|---|
| Top 5% | 4.0 |
| Next 5% OR $300,000 year-over-year Gross Revenue growth | 2.0 |

### Growth Premium Individual Eligibility Criteria Example:

An FA/PWA with $1,000,000 Grid Revenue who ranks within the Top 5% of his/her LOE band in 2015 is eligible for $40,000 [$1,000,000 * 4.0%], if the FA/PWA also meets the Eligibility Criteria as defined above.

### Growth Premium Team Eligibility Criteria Example:

FA 1 and FA 2 are on a Registered Team together as of January 1st, 2015.

- FA 1 has 2015 Gross Revenue of $1,400,000 and 2014 Gross Revenue of $1,150,000, and a LOE of 28; FA 2 has 2015 Gross Revenue of $1,000,000 and 2014 Gross Revenue of $900,000, and a LOE of 21
- Aggregate metrics for the Team are 2015 Gross Revenue of $2,400,000, 2014 Gross Revenue of $2,050,000, and Gross Revenue growth of 17.07%
- The Gross Revenue growth percentage that corresponds to FA 1's LOE band will be used because FA 1 has the highest individual 2015 Gross Revenue on the Team; for illustrative purposes, assume that the Top 10% Gross Revenue growth percentage for FA 1 is 15.00% and the Top 5% Gross Revenue growth threshold for FA 1 is 25.00%

Therefore, the Team qualifies for the Growth Premium because the aggregate Gross Revenue growth (17.07%) is greater than the Top 10% Gross Revenue growth percentage (15.00%), and is then eligible to receive a 2.0% award on their Grid Revenue based on the Growth Premium payout schedule above.

## 25% Additional Business Development Allowance ("BDA")

FA/PWAs who meet the Growth Premium Eligibility Criteria are also eligible for 25% Additional BDA in 2016 based on the 2015 BDA policy. 25% Additional BDA will be funded in the first quarter of 2016. Please refer to Section 3.3 for further details on the BDA program.

## CSA "Go For Growth" Award

FA/PWAs who meet the Growth Premium Eligibility Criteria will have the opportunity to distribute $2,000 to a CSA(s) for supporting growth in the FA/PWA's business. The award will be funded through the CSA compensation systems in the first quarter of 2016. The award recipient must be in a support staff role that is eligible to receive compensation through AFG as of the date of payment, and both the award recipient and distributing FA/PWA must both be employed by the Firm, in good standing, as of the date of payment.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 2: Growth Award**

## 2.3 Lending Award

The Morgan Stanley Wealth Management Lending Award is intended to reward FA/PWAs for expanding their Lending business consistent with the financial needs and investment objectives of clients. The program will consider total growth in PLA (excluding Letters of Credit), ECL, Tailored Lending, Margin, and Mortgage (excluding HELOC).

### Lending Award – Individual Eligibility Criteria

- FA/PWAs must be hired before January 1st, 2013; <u>AND</u>
- Not be part of the Financial Advisor Associate (FAA) program; <u>AND</u>
- Have positive Gross Revenue growth in 2015 with respect to 2014; <u>AND</u>
- Have a minimum of $500,000 in total Lending growth for 2015; <u>AND</u>
- Open 6 new Lending units (PLA (excluding Letters of Credit), ECL, Tailored Lending, Mortgage (excluding HELOC)) in 2015 <u>at the pre-split level</u> (i.e. a new loan opened under a JPN will credit each FA/PWA member of that JPN with 1.0 new loan); <u>AND</u>
- Not end the 2015 year with a 20% Credit Rate

### Lending Award – Team Eligibility Criteria

- FA/PWAs must be hired before January 1st, 2013; <u>AND</u>
- Not be part of the Financial Advisor Associate (FAA) program as of January 1st, 2015; <u>AND</u>
- On a Registered Team in the Team Registry as of January 1st, 2015; <u>AND</u>
- All eligible Team members must properly complete the Team Eligibility Criteria Opt-In Form which must be received by Home Office by the specified date at the time of communication, and in doing so waive their right to be evaluated on an individual basis for the 2015 Lending Award and 2015 Growth Premium; <u>AND</u>
- Aggregate Gross Revenue growth of all eligible FA/PWAs on the Registered Team at the end of 2015 must be positive; <u>AND</u>
- Have a minimum of $500,000 in total Lending growth at the individual level for 2015; <u>AND</u>
- On an individual basis, open 6 new Lending units (PLA (excluding Letters of Credit), ECL, Tailored Lending, Mortgage (excluding HELOC)) in 2015 <u>at the pre-split level</u> (i.e. a new loan opened under a JPN will credit each FA/PWA member of that JPN with 1.0 new loan); <u>AND</u>
- No eligible FA/PWA on the Registered Team has transitioned to a non-producing role at Morgan Stanley at any time during 2015

FA/PWAs who end the 2015 year with a 20% Credit Rate will be included in the Registered Team's aggregate metrics for qualification purposes, but will not be eligible to receive the 2015 Lending Award.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 2: Growth Award**

## Lending Award Calculation

The Lending Award will be calculated as follows:

*PLA (excluding Letters of Credit), ECL, Tailored Lending, and Margin 2015 Growth*: Average outstanding daily balances will determine month-end balances in 2014 and 2015. The average month-end balances for 2015 will be compared to the average month-end balances for 2014 to determine growth in 2015. For JPNs, month-end balances will be split to the members of the JPN based on the month-end JPN split percentages.

*Mortgage (excluding HELOC):* All newly originated Morgan Stanley Private Bank, National Association ("MSPBNA") Mortgages closed and disbursed by December 30th, 2015 will be included in the Lending Award (baseline will be zero). Only Mortgages for which FA/PWAs are eligible for FA/PWA Compensation will be includable in the Lending Award (i.e. FA/PWAs that are not appropriately licensed and NMLS registered will not have the Mortgage(s) included in their Lending Award).

Employee Loans will be included in the Lending growth calculation, as well as count towards Lending units, as specified below. An Employee Loan is a Mortgage secured by a U.S. property and closed and disbursed by MSPBNA to individuals who are full-time or part-time U.S. based employees of Morgan Stanley. A personal Mortgage for an FA/PWA is a Mortgage for which the FA/PWA is a named borrower/co-borrower/obligor in the Mortgage.

A Mortgage is closed at the time all loan proceeds for such Mortgage are disbursed to the named borrower/co-borrower/obligor in the Mortgage:

- An Employee Loan, which is booked in a Primary or Secondary number or a JPN, and is not a personal Mortgage for an FA/PWA in a Primary or Secondary number or a JPN will count toward Lending growth and Lending unit credit
- An Employee Loan booked in a Primary or Secondary number that is the FA/PWA's personal Mortgage will not count toward Lending growth. The Employee Loan will count toward Lending unit credit
- An Employee Loan booked in a JPN where the Employee Loan is a personal Mortgage for an FA/PWA who is a member of the JPN, the FA/PWA related to such personal Mortgage will not receive Lending growth credit. The remaining members of the JPN will receive credit toward Lending growth. The Employee Loan will count toward Lending unit credit for all FA/PWA members of the JPN

To determine the Lending growth in 2015, growth in PLA (excluding Letters of Credit), ECL, Tailored Lending, and Margin as of December 31st, 2015 will be added to new Mortgages closed and disbursed by December 30th, 2015 (excluding HELOC). At year-end, every dollar of qualifying Lending growth is eligible for an award based on the below Lending Award Credit Rate Schedule.

Certain weightings may be applied to some products. Eligible balances and calculation methodology will be determined by the Firm, and the Firm's calculations and methodology will be final.

Lending Award Credit Rate Schedule

| Lending Growth as of 12/31/15 ($) | Net Award (bps) |
|---|---|
| 0–7,500,000 | 35 |
| 7,500,001–15,000,000 | 40 |
| 15,000,001–22,500,000 | 45 |
| 22,500,001–45,000,000 | 50 |

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 2: Growth Award**

**Lending Growth Example:**

FA/PWA has an average total month-end baseline of $45,000,000 in qualified PLA[11], ECL, Tailored Lending, and Margin products in 2014. With an average total month-end PLA[11], ECL, Tailored Lending, and Margin balances for 2015 of $70,000,000, and $10,000,000 in new MSPBNA Mortgages closed[12] as of December 30th, 2015 the FA/PWA will have $35,000,000 in Lending growth as calculated below. Assume the FA/PWA has opened 6 new loans in 2015.

Lending Growth Example

| Month | PLA[11], ECL, Tailored Lending, and Margin Month-End Balance ($) |
|---|---|
| 2014 Baseline | 45,000,000 |
| Jan 2015 | 75,000,000 |
| Feb 2015 | 80,000,000 |
| Mar 2015 | 70,000,000 |
| Apr 2015 | 60,000,000 |
| May 2015 | 90,000,000 |
| Jun 2015 | 75,000,000 |
| Jul 2015 | 50,000,000 |
| Aug 2015 | 40,000,000 |
| Sep 2015 | 75,000,000 |
| Oct 2015 | 70,000,000 |
| Nov 2015 | 80,000,000 |
| Dec 2015 | 75,000,000 |
| **Sum of Total Month-End Balances:** | **840,000,000** |
| **Average Total Month-End Balance:** | **840,000,000 / 12 = 70,000,000** |
| **PLA, ECL, Tailored Lending and Margin Balance Growth in 2015:** | **70,000,000 – 45,000,000 = 25,000,000** |
| **Period** | **New Mortgages Closed[12]** |
| Jan 1st – Dec 30th, 2015 | 10,000,000 |
| **Total Lending Growth:** | **25,000,000 + 10,000,000 = 35,000,000** |

**Lending Award Calculation Example:**

FA/PWA has $35,000,000 of qualifying Lending growth and is eligible for the following award if the FA/PWA also meets the eligibility criteria as defined above:

Lending Growth Example

| Lending Growth ($) | Net Award ($) |
|---|---|
| 7,500,000 at 35 bps | 26,250 |
| Next 7,500,000 at 40 bps | 30,000 |
| Next 7,500,000 at 45 bps | 33,750 |
| Next 12,500,000 at 50 bps | 62,500 |
| **Total:** | **152,500** |

Morgan Stanley Wealth Management reserves the full discretion to review all Lending activity and determine whether such activity is appropriate for exclusion and may, in its sole discretion, exclude any activity that it deems to be inconsistent with the spirit or intent of the Lending Award.

---

[11] Excluding Letters of Credit
[12] Excluding HELOC

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 3: Other Programs**

### 3.1 Capital Accumulation Program

The Capital Accumulation Program ("CAP") provides the opportunity for eligible FA/PWAs (including Producing Branch Managers and Resident Managers) to defer a portion of 2015 monthly Incentive Compensation on a pre-tax basis (up to 25%, in 5% increments) into Morgan Stanley stock units ("Basic Units") and receive a number of bonus stock units based on the amount of Basic Units awarded ("Bonus Units").

FA/PWAs are eligible to participate in CAP for 2015 if they achieved a minimum T-12 Gross Revenue (through September 30th, 2014) of $400,000 and had a minimum of five years of LOS as of December 31, 2014 (provided that, for FA/PWAs who are Chairman's Club members as of December 2014, the minimum service requirement is three years).

Contribution elections, which cannot exceed $200,000 annually, or, for Chairman's Club members as of December 2014, $300,000 annually, must be made by the end of 2014.

FA/PWAs who elect to participate in CAP will be awarded Bonus Units in an amount equal to either 25% (for Chairman's Club members as of December 2014) or 20% (for all other eligible FA/PWAs) of the number of Basic Units awarded.

The Basic Units and Bonus Units will be granted on the 15th day of the month following the end of each calendar quarter, with the number of Basic Units awarded based on the amount of the deferral divided by the fair market value of a share of Morgan Stanley common stock on such date (which is generally the average of the closing prices of Morgan Stanley stock on each of the three month-ends preceding the grant date). Subject to the FA/PWA satisfying the terms and conditions of the award, the Basic Units will vest on the grant date, the Bonus Units will vest on April 15th, 2018, and the Basic Units and Bonus Units will convert to shares of Morgan Stanley common stock on April 15th, 2018.

FA/PWAs must be continuously employed by the Firm through the grant date in order to be awarded the Basic Units and Bonus Units. Termination of employment for any reason prior to the Bonus Unit vesting date will generally result in the cancellation of all Bonus Units and, in general, the previously granted Basic Units will convert to shares of Morgan Stanley common stock on the original scheduled conversion date.

The Basic Units will not be subject to cancellation following grant, but Bonus Units will be subject to cancellation if the FA/PWA engages in certain prohibited activity prior to conversion as described in the award certificate. The stock units will also be subject to sales restrictions and other terms and conditions as set forth in the award certificate and the equity compensation plan under which the awards are granted.

Additional information may be found in the current prospectus, a copy of which may be obtained by accessing the Executive Compensation intranet website located at the following address: http://execcomp.corpms.com/site/execcomp/webapp/portfolio.jsp

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 3: Other Programs**

## 3.2 Former Advisor Program

Exceptional client service is the foundation of our business, which is why Morgan Stanley Wealth Management offers flexibility and assistance to FA/PWAs considering retirement. The Former Advisor Program ("FAP") was developed to ensure that eligible participants can be competitively compensated and the clients they worked hard to serve can receive a smooth transition and be well cared for.

The following five options, which may not be mutually exclusive, are currently offered:

- **Individual FA/PWA Option** for FA/PWAs with client accounts not under a Joint Production Agreement (JPA)
- **Joint Production Option** for FA/PWAs servicing accounts under a JPA for the duration required by current applicable policy
- **Teaming Option** for FA/PWAs who are members of a Registered Team, or FA/PWAs who join and transition their book of business to a Registered Team for the duration required by current applicable policy
  - Eligible to receive Team Compensation for 2, 3, or 4 years prior to retirement date, in addition to receiving Team Compensation Cash Credits on FAP
- **Enhanced Option** for FA/PWAs who, for at least 2 years, have been a member of a JPA or Registered Team from which more than 50% of their revenue is generated
- **Platinum Option** for President's or Chairman's Club FA/PWAs who, for at least two years, have been a member of a JPA or Registered Team from which more than 50% of their revenue is generated
  - Eligible to receive a 2, 3, or 4 year upfront loan-bonus arrangement equal to 50% of T-12 Gross Revenue, prior to retirement date, in addition to the Enhanced Option FAP after retirement

For more information on eligibility and conduct requirements / restrictions for retiring FA/PWAs ("Former Advisors") and Active FA/PWA(s) participants, please refer to the Former Advisor Program 2015 - Guide located on the 2015 FA/PWA Compensation website on 3DR > Practice > FA Compensation 2015 or contact your local Human Resources representative.

*Please be advised that FAP is subject to SEC, FINRA, and state regulatory requirements. The terms of the FAP are subject to change at the discretion of Morgan Stanley Wealth Management for any reason, including changes in applicable regulatory or legal requirements pertaining to such programs.*

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 3: Other Programs**

### 3.3 Business Development Allowance ("BDA") Program

Under the Business Development Allowance ("BDA") Program, eligible FA/PWAs will have access to corporate funds for business development purposes such as client entertainment, seminars and/or marketing. At year-end, any unused BDA will be forfeited and will not carry over into the following year. BDA allocations are determined in January 2015 and are based on 2014 Gross Revenue and the following schedule:

Business Development Allowance

| 2014 Gross Revenue ($) | Allowance ($) |
| --- | --- |
| 10,000,000+ | 25,000 |
| 5,000,000–9,999,999 | 20,000 |
| 2,500,000–4,999,999 | 15,000 |
| 1,650,000–2,499,999 | 12,000 |
| 1,100,000–1,649,999 | 10,000 |
| 825,000–1,099,999 | 5,000 |
| 550,000–824,999 | 3,000 |
| 440,000–549,999 | 1,000 |
| 330,000–439,999 | 500 |
| 0–329,999 | 250 |

Associate/FAAs generating Gross Revenue receive a BDA based on eligible Gross Revenue as per the policy above. Associate/FAAs who begin generating Gross Revenue in the current year receive a pro-rated BDA using the lowest revenue band.

The BDA allocation is subject to the Firm's policies and procedures for expenditures.

**Team BDA Transfer**

FA/PWAs who are part of a Registered Team will have the ability to transfer BDA to other FA/PWAs on their Registered Team, as well as certain qualified exempt support staff employees during the AFG Election period in December 2014. Additional details can be found on the 2015 FA/PWA Compensation website.

### 3.4 Alternative Flexible Grid

The Alternative Flexible Grid ("AFG") is a mechanism through which FA/PWAs, prior to the start of the year, may elect an effective Credit Rate adjustment for the year and, based on the election, direct the Firm to provide additional compensation to support staff as well as additional resources above those necessary to perform FA/PWA duties. In order to participate in the AFG Program, the FA/PWA must have a minimum $200,000 in Trailing-12 month eligible Gross Revenue (excludes Zero % Revenue).

The AFG is calculated via the AFG worksheet prior to the start of the year. In this worksheet, the effective Credit Rate adjustment is calculated by determining expected additional support staff compensation and additional luxury resources. With Branch Manager approval, this effective Credit Rate adjustment will be applied to all transactions for the following year. Upon the implementation of this Credit Rate adjustment, Incentive Compensation is determined as set forth in this Program.

The magnitude of the effective Credit Rate adjustment elected will determine the AFG amount. This amount will enable the FA/PWA to direct the Firm to provide additional support staff compensation and additional luxury resources. Any remaining balance at year-end will not be carried forward into the following year.

FA/PWAs will be provided a seven month check-point, during which they will be granted an open window to adjust their effective Credit Rate adjustment for the time remaining in the year. If an adjustment is made during the check-point, a new AFG worksheet must be completed.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 3: Other Programs**

All AFG arrangements will be cancelled at year-end, and FA/PWAs must re-elect for the following year. No balance will be carried forward into the following year.

**Example:**

FA/PWA with Trailing-11 month Gross Revenue of $550,000 and expected additional support staff compensation/additional luxury resources election of $11,000:

- The effective Credit Rate adjustment is determined by dividing the $11,000 expected additional support staff compensation/additional luxury resources by Trailing-11 month Gross Revenue of $550,000. In this case, the Credit Rate adjustment is 2% ($11,000/$550,000)

FA/PWAs will have the option to enter a maximum funding amount for 2015 AFG during the AFG Election period in December 2014. The maximum funding amount must be the greater of $10,000 OR 110% of the contribution budget determined during the AFG Election period in December 2014.

Additional details on the 2015 Alternative Flexible Grid program can be found on the 2015 FA/PWA Compensation website.

### 3.5 Discretionary Fee Waiver Allowance

The Discretionary Fee Waiver Allowance ("DFWA") is provided to FA/PWAs to waive select Account and Service fees in client accounts. It is important to note that some of these fees are already waived as part of the Reserved Program. At year-end, any unused DFWA will be forfeited and will not carry over into the following year. Allowances are based on prior year Gross Revenue, as follows:

Discretionary Fee Waiver Allowance

| Prior Year Gross Revenue ($) | Discretionary Fee Waiver Allowance ($) |
|---|---|
| 2,200,000+ | 4,000 |
| 1,650,0000–2,199,999 | 3,000 |
| 1,100,000–1,649,999 | 2,750 |
| 825,000–1,099,999 | 2,500 |
| 550,000–824,999 | 2,000 |
| 275,000–549,999 | 1,500 |
| 110,000–274,999 | 500 |
| 0–109,999 | 0 |

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY.NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 4: Recognition Programs**

## 4.1 Club Memberships for 2016

The Firm's recognition programs are designed to recognize outstanding performance by FA/PWAs. In addition to demonstrated leadership in the best practices of wealth management, the Firm's recognition Club Members must be in good standing and satisfy other aspects of the Firm's performance, conduct and compliance standards and expectations, as determined by the Firm.

At the beginning of 2016, Club Memberships will be assigned based on 2015 calendar year Gross Revenue OR 2015 calendar year Total Revenue Premium, as well as LOE and Assets Under Management ("AUM") for Pacesetter's Club only, as follows:

Club Memberships

| Club Type | Qualifying Criteria |
|---|---|
| Chairman's Club | Rank amongst the top 2% of the FA/PWA population in Gross Revenue for 2015 OR amongst the top 2% in Total Revenue Premium for 2015 |
| President's Club | Rank amongst the next 5% of the FA/PWA population (after Chairman's Club) in Gross Revenue for 2015 OR amongst the next 5% in Total Revenue Premium for 2015 |
| Master's Club | Rank amongst the next 10% of the FA/PWA population (after President's Club) in Gross Revenue for 2015 OR amongst the next 10% in Total Revenue Premium for 2015 AND achieve minimum Gross Revenue of $700,000 |
| Century Club | Rank in the next 10% of the FA/PWA population (after Master's Club) in Gross Revenue for 2015 OR amongst the next 10% in Total Revenue Premium for 2015 |
| Pacesetter's Club (FA/PWAs with an LOE of 5 and below will only be eligible for this Club) | Achieve minimum Gross Revenue of $100,000 OR minimum Total Revenue Premium of $140,000 AND minimum AUM of $8,000,000 for FA/PWAs with an LOE of 0, 1 |
| | Achieve minimum Gross Revenue of $200,000 OR minimum Total Revenue Premium of $280,000 AND minimum AUM of $15,000,000 for FA/PWAs with an LOE of 2 |
| | Achieve minimum Gross Revenue of $250,000 OR minimum Total Revenue Premium of $350,000 AND minimum AUM of $20,000,000 for FA/PWAs with an LOE of 3 |
| | Achieve minimum Gross Revenue of $300,000 OR minimum Total Revenue Premium of $420,000 AND minimum AUM of $25,000,000 for FA/PWAs with an LOE of 4 |
| | Achieve minimum Gross Revenue of $350,000 OR minimum Total Revenue Premium of $490,000 AND minimum AUM of $30,000,000 for FA/PWAs with an LOE of 5 |

Fixed dollar Gross Revenue and Total Revenue Premium qualification thresholds will be communicated in the second half of 2015 for Chairman's Club, President's Club, Master's Club, and Century Club levels.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 4: Recognition Programs**

## 4.2 Titles

In addition to specific recognition clubs, the Firm also grants titles to recognize the outstanding performance of Morgan Stanley Wealth Management FA/PWAs. Titles are awarded based on achievement of specific Gross Revenue levels and the maintenance of high standards of the Firm, including being in good standing and satisfying the Firm's expectations for excellence in all areas, including, but not limited to, guardianship, personal conduct, and adherence to regulatory and compliance requirements.

**<u>Managing Director, Wealth Management</u>**

Eligibility: Minimum cumulative Gross Revenue of $8,800,000 <u>OR</u> Total Revenue Premium of $12,300,000 over the last three years[13].

FA/PWAs who meet the 3-year Gross Revenue <u>OR</u> Total Revenue Premium requirement are eligible for selection by the Firm for the Managing Director, Wealth Management title.

Additional criteria for Managing Director, Wealth Management includes:

- Exhibiting leadership both externally and internally
- Being an ambassador and role model of Morgan Stanley Wealth Management's vision and business principles
- Pursuing excellence and holding self and others to the highest standards
- Consistently exemplifying high standards of corporate guardianship

**<u>Executive Director</u>[14]**

Eligibility: Minimum cumulative Gross Revenue of $4,400,000 <u>OR</u> Total Revenue Premium of $6,150,000 over the last two years.

FA/PWAs who meet the 2-year Gross Revenue <u>OR</u> Total Revenue Premium requirement are eligible for selection by the Firm for the Executive Director title.

**<u>Senior Vice President</u>**

Eligibility: Minimum Prior Year Gross Revenue of $1,100,000 <u>OR</u> Total Revenue Premium of $1,550,000

**<u>First Vice President</u>**

Eligibility: Minimum Prior Year Gross Revenue of $825,000 <u>OR</u> Total Revenue Premium of $1,150,000

**<u>Vice President</u>**

Eligibility: Minimum Prior Year Gross Revenue of $550,000 <u>OR</u> Total Revenue Premium of $770,000

**<u>Associate Vice President</u>[15]**

Eligibility: Minimum Prior Year Gross Revenue of $440,000 <u>OR</u> Total Revenue Premium of $615,000

---

[13] Prior three year Total Revenue Premium will include Total Revenue Premium for 2015 and 2014, and 2013 Gross Revenue multiplied by the FA/PWA's average Total Revenue Premium to Gross Revenue ratio for 2015 and 2014 to derive 2013 Total Revenue Premium
[14] Upon achieving Executive Director status FA/PWAs may choose to remain Senior Vice President or take the Executive Director title
[15] Private Wealth Advisors are not eligible for Associate Vice President

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

## SECTION 5: Other

### 5.1 Summary and Additional Information

Morgan Stanley Wealth Management provides one of the most comprehensive FA/PWA Compensation Plan, Growth Award and Recognition Programs in the securities industry.

This brochure summarizes the Morgan Stanley Wealth Management FA/PWA Compensation Plan, Growth Award and Recognition Programs in effect for 2015 unless otherwise noted. Morgan Stanley Wealth Management reserves the right to amend, modify, interpret or terminate all or any part of the Program for any year and at any time. Nothing in this brochure is a guarantee of continued employment or of any particular benefits or level of remuneration.

This Compensation Plan and the additional product guidelines and policies referenced in this Compensation Plan set forth guidelines only. Notwithstanding anything to the contrary contained in this Compensation Plan or elsewhere, Morgan Stanley Wealth Management has the sole discretion to determine whether to allocate Credit to an FA/PWA's Gross Revenue (or to provide compensation in any form) for any particular business and, if so, the amount of Credit to be allocated or the amount of compensation to be awarded, and further Morgan Stanley Wealth Management may adjust and/or decline to award future Credits towards Incentive Compensation where an FA/PWA has an unsatisfied obligation to the Firm. Under no circumstances is an FA/PWA eligible to receive any Credit to Gross Revenue or any compensation for any particular business unless and until Morgan Stanley Wealth Management receives the revenue associated with that business. Furthermore, if an FA/PWA is determined to have engaged in activity that is inconsistent with Morgan Stanley's expectations for good guardianship, or not in line with any policy, regulation or otherwise counter to the best interests of our clients, then such FA/PWA may be deemed, in Morgan Stanley's discretion, not to have qualified for compensation, growth awards or any bonus program listed herein. If an FA/PWA's employment terminates for any reason before Morgan Stanley Wealth Management receives the revenue for any particular business, the FA/PWA will not be eligible for any Credit to Gross Revenue or any compensation associated with that business and, in the event Morgan Stanley Wealth Management ultimately refunds all or a portion of such revenue for any reason, any associated Incentive Compensation paid on the basis of such revenue shall be deemed an overpayment to the FA/PWA. Additionally, an FA/PWA must be employed in good standing at the time that Morgan Stanley Wealth Management receives the revenue to be eligible for any Credit to Gross Revenue or any compensation associated with that business.

Morgan Stanley Wealth Management retains the full discretion and authority to interpret, modify, and/or terminate the Compensation Plan, or any of the individual guidelines described in the Compensation Plan, at any time, with or without notice, and to resolve any dispute arising out of or in any way related to the Compensation Plan. Morgan Stanley Wealth Management's interpretations and decisions shall be final and binding on all parties.

The information contained in this brochure briefly describes certain employee compensation programs and deferred incentive compensation awards and other arrangements. It is important to note that this brochure merely summarizes the provisions of those programs, awards and plans, and does not address all of their terms, conditions and restrictions. FA/PWAs should consult the pertinent compensation program, equity plan document or award certificate for a full explanation of their provisions. If there is a conflict between this brochure and any formal compensation program, equity plan document or award certificate, then the formal program, plan document or award certificate will control. All compensation and recognition plans are subject to changes due to tax laws and other legal requirements or at the discretion of Morgan Stanley Wealth Management.

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

**SECTION 5: Other**

## 5.2 Version History

This section tracks changes made to the FA/PWA Compensation Plan, Growth Award and Recognition Programs during 2015. The table below documents the date, page number and a brief description of the change for easy reference.

| Date | Page Number | Description |
| --- | --- | --- |
| December 1, 2014 | | Initial Publication |
| January 12, 2015 | 6 | Clarification to LOS definition |

FOR INTERNAL MORGAN STANLEY WEALTH MANAGEMENT USE ONLY. NOT TO BE DISPLAYED OR DISTRIBUTED TO THE GENERAL PUBLIC.

# EXHIBIT B

## Morgan Stanley | MY PRACTICE CUSTOM REPORT
Feb 16, 2016

### Growth Award Contract
Arthur Irving martin
PRINCETON NJ LOC

#### Growth Award Contracts

| 2015 Growth Award Details | As of: Feb 16, 2016 |
|---|---|
| Advisor Name | martin, Irving Arthur |
| Forecasted Growth Award ($) | 47,075.72 |

| 2015 Growth Award Status | As of: Feb 16, 2016 |
|---|---|
| Growth Award Document | Both 'Growth Award Bonus Agreement' and 'Promissory Note' Approved |
| Bonus Agreement | Approved on Feb 16 2016 4:18PM |
| Promissory Note | Approved on Feb 16 2016 4:18PM |

**2015 GROWTH AWARD BONUS AGREEMENT**

**EMPLOYEE NAME: martin, Arthur Irving**

**AMOUNT-BONUS PAYMENT: $9,415.14**

This Growth Award Bonus Agreement (the "Agreement") is made this 15th day of March, 2016, by and between Morgan Stanley Smith Barney LLC, a Delaware limited liability company ("Morgan Stanley"), and the above-named employee ("Employee").

WHEREAS Employee is currently employed as a financial advisor/private wealth advisor by Morgan Stanley;

WHEREAS, Morgan Stanley has determined that Employee will be eligible to receive certain bonus payments as described in this Agreement, provided that Employee satisfies the terms and conditions set forth in this Agreement; and

WHEREAS, Employee desires to accept the terms and conditions of the bonus payments described in this Agreement, including agreeing to the covenants as set forth in this Agreement.

NOW THEREFORE, Morgan Stanley and Employee agree as follows:

1. In consideration of Employee's anticipated continued employment with Morgan Stanley and the recognition of the value of such services to be rendered by Employee with Morgan Stanley, and subject to the other provisions of this Agreement, if Employee remains continuously employed, in good standing, with Morgan Stanley, meets Morgan Stanley's expectations for good guardianship, and complies with applicable policies and regulations, Morgan Stanley shall pay to Employee a bonus payment within fifteen (15) business days following March 15th, 2017, the amount of which shall be determined by Morgan Stanley, in its sole discretion, in March 2016 (the "Bonus Payment"), but which amount shall be not less than the Bonus Payment amount listed above; provided that, to receive the Bonus Payment, Employee must be employed by Morgan Stanley, in good standing, on the date of payment of such Bonus Payment. Thereafter, on each March 15th thereafter, through and including March 15th, 2021, Morgan Stanley will pay to Employee the Bonus Payment within fifteen (15) business days following the applicable March 15th, provided that Employee continues to be employed by Morgan Stanley, in good standing, on the date of payment of the Bonus Payment. Any such Bonus Payment, when paid, may, at Morgan Stanley's discretion, be applied to repay any outstanding indebtedness owed by Employee to Morgan Stanley or any of its affiliates.

All payments hereunder shall be subject to withholding of all applicable Federal, state and local income taxes, as well as FICA, and all other employment taxes required by law to be withheld. Employee shall be solely responsible for all income and employee-side employment taxes that result from Employee's receipt of the Bonus Payments. The Bonus

**Morgan Stanley** | MY PRACTICE CUSTOM REPORT
Feb 16, 2016

| Growth Award Contract | Arthur Irving martin |
| --- | --- |
| | PRINCETON NJ LOC |

Payments shall not be eligible for computation of benefits or compensation under any Morgan Stanley, or any related entity or affiliate compensation or benefits plans, including any wealth or capital accumulation plan.

2. No Bonus Payment shall become due and payable hereunder unless (a) Employee is continuously in the employ of Morgan Stanley, in good standing, from the date of this Agreement, to and including the date such payment is due and payable according to the schedule described in paragraph 1 above, and (b) Employee has maintained all licenses and registrations from the Financial Industry Regulatory Authority, exchanges, state securities commissions and other regulatory bodies as Morgan Stanley shall determine necessary in order to conduct securities or futures transactions; provided, that, in the event Employee has not obtained or retained all such licenses and registrations at the time the bonus is payable, such amounts scheduled to be paid will be forfeited. As used herein, the term "good standing" shall mean, among other things, that Employee is current on the payment of all outstanding financial obligations to the Firm. Furthermore, if Employee is determined to have engaged in activity that is inconsistent with Morgan Stanley's expectations for good guardianship, or not in line with any policy or regulation or otherwise counter to the best interests of Morgan Stanley's clients, including with respect to any revenues used in the calculation of the Bonus Payment, then Employee may be deemed, in Morgan Stanley's discretion, not to have qualified for any Bonus Payments, and Morgan Stanley may, in its discretion, cancel or reduce the Bonus Payment. In the event Employee's employment terminates voluntarily or involuntarily for any reason or no reason other than on account of death or Disability (as defined below) after this Agreement is executed by all parties hereto, Employee shall not be entitled to receive any future Bonus Payments under this Agreement. If Employee's employment with Morgan Stanley terminates on account of death or Disability, Morgan Stanley shall pay to Employee (or Employee's estate, in the event of death) a lump sum cash payment in an amount equal to the total Bonus Payments that would have been payable to Employee for the remainder of the period described in paragraph 1 above if Employee had remained employed in good standing with Morgan Stanley, which amount shall first be applied to repay any outstanding indebtedness owed by Employee to Morgan Stanley or any of its affiliates, and the remainder of which shall be paid to Employee (or Employee's estate, in the event of death). Such lump sum shall be paid within sixty (60) days following the date of Employee's termination of employment with Morgan Stanley on account of death or Disability. For purposes of this Agreement, the term "Disability" shall mean Employee has proven to be totally disabled under Morgan Stanley's long-term disability program whether or not Employee is covered under that program.

3. Other than as set forth herein, Employee agrees that Employee is not entitled to any other compensation from Morgan Stanley or any of its affiliated entities in connection with the Growth Award Program.

4. This Agreement does not prohibit or restrict Employee from lawfully (a) initiating communications directly with, cooperating with, providing relevant information to, or otherwise assisting in an investigation by: (i) the Securities and Exchange Commission ("SEC"), FINRA, or any other governmental or regulatory body or official(s) or self-regulatory organization ("SRO") regarding a possible violation of any federal law relating to fraud or any SEC rule or regulation; or (ii) the EEOC or any other governmental authority with responsibility for the administration of fair employment practices laws regarding a possible violation of such laws; (b) responding to any inquiry from such authority, including an inquiry about the existence of this Agreement or its underlying facts or circumstances; or (c) testifying, participating, or otherwise assisting in an action or proceeding relating to a possible violation of any such law, rule, or regulation. Further, nothing in this Agreement shall prohibit or restrict Employee (or Employee's attorney) from initiating communications directly with, or responding to any inquiry from, or providing testimony before, the SEC, FINRA, or any other SRO or any other federal or state regulatory authority, regarding this Agreement or its underlying facts or circumstances, or regarding any potentially fraudulent or suspicious activities. Nor does this Agreement require Employee to notify Morgan Stanley or any of its affiliated entities of such communications or inquiry described in this paragraph 4.

5. This Agreement and any Bonus Payment payable hereunder shall not be subject to option or assignable either by voluntary or involuntary assignment or by operation of law including (without limitation) bankruptcy, garnishment, attachment or other creditors' process; provided, however, that the provisions of this paragraph 5 shall not apply to any successor, parent, affiliate or subsidiary of Morgan Stanley. Upon the purported grant by Employee of an option over, or purported assignment by Employee of, any Bonus Payment in contravention of the preceding sentence, the obligation of Morgan Stanley to pay such Bonus Payment shall be extinguished, and neither Employee nor any other party shall have any further right thereto.

**Morgan Stanley** | MY PRACTICE CUSTOM REPORT
Feb 16, 2016

| Growth Award Contract | Arthur Irving martin |
| --- | --- |
| | PRINCETON NJ LOC |

6. Except as provided in paragraph 7 below, this Agreement (a) contains the entire agreement between the parties relating to Bonus Payments to be paid to Employee in connection with the present Growth Award Program, and supersedes any prior oral or written agreement relating to such payments and (b) cannot be altered or amended except by a written agreement executed by Morgan Stanley and Employee. Notwithstanding the foregoing, Morgan Stanley retains the right to make modifications to this Agreement, other than the provisions of paragraph 7 below, that it deems advisable, in its sole discretion, to allow it, its parents, and/or affiliates to comply with or satisfy any legal, regulatory, or governmental requirements or to qualify for any government loan, subsidy or other program.

7. Arbitration Agreement

(a) Except as provided herein, and to the fullest extent permitted by law, any controversy or claim arising out of or in any way relating to this Agreement or any benefits or payments available and/or due under this Agreement, as well as any controversy or claim between Employee and Morgan Stanley, or any of Morgan Stanley's former, existing, and future domestic parents, subsidiaries, partners, predecessors, successors and affiliate corporations and business entities, or any of its or their current, former, and future directors, officers, employees, agents, managers, shareholders, and other representatives, based on, arising out of, or which arose out of or in any way relate to Employee's employment, compensation, and terms and conditions of employment with Morgan Stanley or any of Morgan Stanley's former, existing, and future domestic parents, subsidiaries, partners, predecessors, successors and affiliate corporations and business entities or the termination thereof, and claims based on, arising out of , or which arose out of or in any way relate to Employee's recruitment or application for employment and hiring, including, but not limited to contract, tort, defamation, breach of fiduciary duty and other common law claims, wage and hour claims, statutory discrimination, harassment and retaliation claims, and claims under, based on, or relating to any federal, state or local constitution, statute or regulation of any country, state or municipality, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any other federal, state or local wage and hour, discrimination or employment law, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized, (individually and collectively referred to herein as "Covered Claims"), will be resolved by final and binding arbitration as set forth in this arbitration agreement and in the arbitration provisions of the CARE Guidebook, a copy of which can be found by visiting the HR Policies site on the Firm's intranet or by requesting it from CAREbox@morganstanley.com. **This arbitration agreement applies with respect to all Covered Claims, whether initiated by Employee or Morgan Stanley, including any Covered Claims based on, arising out of, or which arose out of or in any way relate to acts and omissions that occurred before you and Morgan Stanley entered into this Arbitration Agreement, and makes arbitration the required and exclusive forum for the resolution of all Covered Claims. By entering into this arbitration agreement, Employee and Morgan Stanley each acknowledge and agree that, to the fullest extent permitted by law, Employee and Morgan Stanley are giving up any right to a jury trial in any forum.**

(b) Except as specified herein or in the CARE Guidebook, any arbitration of a Covered Claim will be conducted under the auspices and rules of the Financial Industry Regulatory Authority ("FINRA") in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes ("FINRA Arbitration Rules").[1] If a Covered Claim may not be arbitrated before FINRA or is ineligible for or otherwise excluded from or not subject to arbitration before FINRA, then such Covered Claim will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Employment Arbitration Rules and Procedures and the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("JAMS Arbitration Rules"),[2] except as specified herein or in the CARE Guidebook. In addition, employment discrimination claims under or based on any federal, state or local law (including claims of harassment and retaliation under those laws) will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Arbitration Rules, except as specified herein or in the CARE Guidebook. To the extent any of the terms, conditions or requirements of the arbitration agreement in this paragraph 7 conflict with the JAMS Arbitration Rules or FINRA Arbitration Rules, the terms, conditions or requirements of this arbitration agreement shall govern. Except as specified herein, the applicable arbitration rules will be the rules of the selected arbitration forum as indicated above, or any successor rules or, if none exist, the rules most applicable to employment claims and disputes and, if the forum no longer exists, the successor forum or, if neither the forum nor a successor forum exists, the rules most applicable to employment claims and disputes of a similar forum.

Morgan Stanley | MY PRACTICE CUSTOM REPORT
Feb 16, 2016

## Growth Award Contract

Arthur Irving martin
PRINCETON NJ LOC

(c) The following claims and disputes are not Covered Claims and are not subject to this arbitration agreement: (i) applications by any party for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims for workers' compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation benefits, (iii) claims for unemployment compensation benefits, (iv) claims under the National Labor Relations Act, as amended within the exclusive jurisdiction of the National Labor Relations Board, and (v) any claim that is expressly precluded from arbitration by a federal statute. This arbitration agreement also does not apply to any claim in a court action in which Employee is individually named as a plaintiff, opt-in plaintiff, defendant or other named party and which is pending in court on the date this Agreement was sent to Employee, or to any claim in a certified or uncertified class, collective, or representative action which is pending in court on the date this Agreement was sent to Employee, and any such claims shall be governed by the most recent arbitration agreement between Employee and Morgan Stanley applicable to such claims. Nothing in this Agreement shall prohibit Employee from filing a charge, complaint or claim or communicating or cooperating with, providing information to, or participating in an investigation by the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the U.S. Department of Labor, the Occupational Safety and Health Commission, or any other federal, state, or local administrative agency. Employee also has the right to challenge the validity of the terms and conditions of the arbitration agreement in this paragraph 7 on any grounds that may exist in law and equity, and Morgan Stanley shall not discipline, discharge, or engage in any retaliatory actions against Employee in the event Employee chooses to do so or engages in other protected legal activity. Morgan Stanley, however, reserves the right to enforce the terms and conditions of this arbitration agreement in any appropriate forum.

(d) WAIVERS. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EMPLOYEE AND MORGAN STANLEY AGREE THAT NO COVERED CLAIMS MAY BE INITIATED, MAINTAINED, HEARD OR DETERMINED ON A CLASS ACTION, COLLECTIVE ACTION, OR REPRESENTATIVE ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT EMPLOYEE IS NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION MEMBER OR REPRESENTATIVE OR TO RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION. Employee further agrees that if Employee is included within any class action, collective action, or representative action in court or in arbitration involving a Covered Claim, Employee will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be. Any issue concerning the validity or enforceability of any of the class action, collective action, and representative action waivers contained in this arbitration agreement ("Waivers") shall be governed by and determined under and in accordance with the FAA, and shall be decided by a court of competent jurisdiction, and not by an arbitrator. Any issue concerning arbitrability of a particular issue or claim pursuant to this arbitration agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court. Insofar as any Covered Claim is permitted to proceed on a class action, collective action, or representative action basis, it must do so in a court of competent jurisdiction and not in arbitration. Insofar as any Covered Claim is not eligible for arbitration or otherwise is excluded from or not subject to arbitration, for any reason, the class action, collective action, and representative action Waivers apply and remain valid and enforceable with respect to such Covered Claim. For the sake of clarity, nothing in this arbitration agreement shall preclude Employee from pursuing or participating in any claim, including any class action, collective action, or representative action in court where Employee's claim is based solely on Employee's status as a customer or an investor and does not arise out of or in any way relate to Employee's employment relationship with Morgan Stanley.

(e) Arbitration shall be held in the county of Employee's current or last principal place of employment with Morgan Stanley or, if not practicable, in the county closest to Employee's current or last principal place of employment with Morgan Stanley where the arbitration can be held. If Employee's current or last principal place of employment with Morgan Stanley is outside of the U.S., the arbitration shall be held in New York, New York.

(f) Arbitrators are required to issue a written award and, subject to the parties' right to appeal or seek vacatur under applicable law, their awards shall be final and binding, and any judgment or award issued by the arbitrator may be entered in any court having competent jurisdiction. No arbitration award or decision will have any preclusive effect as to any issues or claims in any other arbitration or court proceeding unless each of the parties in such proceeding was also a named party in the arbitration.

**Morgan Stanley** | MY PRACTICE CUSTOM REPORT
Feb 16, 2016

Growth Award Contract

Arthur Irving martin
PRINCETON NJ LOC

(g) Arbitrators are authorized to award any party the full remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction, including attorneys' fees and costs. Thus, for example, Employee shall be entitled to recover attorney's fees and costs in any arbitration in which Employee asserts and prevails on any statutory claims or counterclaims to the same extent as Employee could in court.

(h) Additional Provisions Applicable to Arbitration at JAMS

(i) Arbitrators. Any arbitration of Covered Claims before JAMS shall be conducted before a single arbitrator, unless all parties to the arbitration agree in writing to conduct the arbitration before a panel of three arbitrators.

(ii) Procedure. The parties may file and the JAMS arbitrator shall hear and decide at any point in the proceedings any motion permitted by the Federal Rules of Civil Procedure, including but not limited to motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine. In addition, the arbitration shall be subject to the same rules of evidence, burdens of proof and statutes of limitations as if the Covered Claim was being heard in the appropriate federal or state court.

(iii) Awards. JAMS Arbitrators are required to issue a written award, which shall include a reasoned and detailed decision stating the reasons upon which it is based and supported by essential facts and conclusions of law.

(iv) Arbitration Fees. Except as provided by law and as provided below for statutory claims and counterclaims, in any arbitration before JAMS, Employee shall be responsible for any filing fee required to initiate arbitration or to assert any counterclaims up to the amount of the filing fee if any Employee would have incurred had Employee filed such claims in court, and Morgan Stanley shall be responsible for all additional arbitration filing fees, forum fees, arbitrator fees, and other administrative fees and costs of the arbitration forum.

(i) Additional Provisions Applicable to Statutory Claims and Counterclaims. Subject to any applicable fee-shifting provisions, if Employee initiates arbitration of statutory claims with FINRA or JAMS or asserts any statutory claims as counterclaims, Employee shall be responsible for the filing fee required to initiate arbitration of such claims or to assert such counterclaims up to the amount of the filing fee Employee would have incurred had Employee filed such claims in court, and Morgan Stanley shall be responsible for all additional arbitration filing fees, forum fees, arbitrator fees, and other administrative fees and costs of the arbitration forum.

8. All Bonus Payments payable under this Agreement are intended to be exempt from section 409A of the Internal Revenue Code of 1986, as amended (the "Code") in reliance on the short-term deferral exemption set forth in the final regulations issued thereunder. Notwithstanding the foregoing, if it is subsequently determined that the Bonus Payments payable under this Agreement are not so exempt, then this Agreement shall be administered and interpreted in a manner intended to cause the Bonus Payments to comply with section 409A of the Code, such that the accelerated taxation and tax penalty provisions of section 409A of the Code do not apply to the Bonus Payments. In addition, if the Bonus Payments constitute deferred compensation subject to the requirements of section 409A of the Code and such amounts are payable to Employee upon "separation from service" (within the meaning of section 409A(a)(2)(a)(i) of the Code and its corresponding regulations) from Morgan Stanley, then if Employee is a "specified employee" (as such term is defined in section 409A(2)(B)(i) of the Code and its corresponding regulations) as determined by Morgan Stanley (or any successor thereto), in its sole discretion, then all payments to Employee on separation from service pursuant to this Agreement shall be postponed for a period of six (6) months following Employee's separation from service from Morgan Stanley. The postponed amounts shall be distributed to Employee within thirty (30) days after the date that is six (6) months following Employee's separation from service from Morgan Stanley. No delay is required if Employee's separation from service is on account of death. In no event may Employee designate the calendar year in which the Bonus Payments will be paid. While the Bonus Payments payable under this Agreement are intended to be exempt from section 409A of the Code, neither Morgan Stanley or any of its

Morgan Stanley | MY PRACTICE CUSTOM REPORT
Feb 16, 2016

affiliates has made any representation, warranty or guarantee of any federal, state or local tax consequences of Employee's receipt of the Bonus Payments hereunder, including, but not limited to, under section 409A of the Code.

9. Any obligation set forth hereunder to provide payment of the Bonus Payments to Employee is the obligation of Morgan Stanley. Morgan Stanley's affiliated entities shall have no obligation to provide payment of the Bonus Payments to Employee, are not guaranteeing any such payments, and shall not have any liability to Employee with respect to such payments.

10. Any breach of this Agreement by Employee shall result in the forfeiture of Employee's right to further Bonus Payments pursuant to this Agreement.

11. This Agreement is not a contract of employment for any period of time. Employee's employment with Morgan Stanley is on an at-will basis and nothing herein shall be construed as a contract of employment for a definite term. Accordingly, Employee's employment can be terminated at any time with or without cause at the option of either Employee or Morgan Stanley.

12. All notices, requests, demands and other communications to be given to the Employee pursuant to this Agreement shall be in writing and shall be deemed to have been duly given if delivered by hand, e-mail or overnight courier or mailed by registered or certified mail, return receipt requested, postage prepaid addressed to the Employee's last known address or such other address as the Employee shall have designated by notice in writing to Morgan Stanley, or any successor thereto, in accordance with this paragraph. All notices, requests, demands and other communications to be given to Morgan Stanley pursuant to this Agreement shall be in writing and shall be deemed to have been duly given if delivered by hand, e-mail or overnight courier or mailed by registered or certified mail, return receipt requested, postage prepaid addressed to the address set forth in the corporate records or such other address as Morgan Stanley shall have designated by notice in writing to Employee in accordance with this paragraph.

13. This Agreement shall inure to the benefit of Morgan Stanley and its affiliates, parents, subsidiaries, successors, or assigns, whether through merger, acquisition, sale or other transfer. Morgan Stanley retains the right to assign its rights, title and interest in this Agreement as it may elect. Employee expressly consents to any such, or any subsequent, assignment.

14. Employee further acknowledges that the Bonus Payments payable under this Agreement exceed any payment or thing of value to which Employee is otherwise entitled, and are just and sufficient consideration for the agreements, waivers, and commitments set forth herein.

15. As stated above, the provisions of the arbitration agreement in paragraph 7 hereof, including the Waivers set forth in paragraph 7(d) of the arbitration agreement, shall be governed by and interpreted in accordance with the FAA. The remaining provisions of this Agreement shall be governed by and interpreted in accordance with the laws of the State of New York, without regard to conflicts of laws principles.

16. The provisions of this Agreement shall be severable and, if any provision of this Agreement shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof and may be severed from the remaining provisions as appropriate, to the extent permitted by law. In the event any of the Waivers set forth in paragraph 7(d) above are determined to be invalid, unenforceable or void with respect to a particular Covered Claim, that Covered Claim and only that Covered Claim shall proceed in a court of competent jurisdiction and not in arbitration (and such court shall be the exclusive forum for such claim) and the Waivers set forth in paragraph 7(d) above shall remain effective and enforceable with respect to all other Covered Claims. If a court of competent jurisdiction determines that a particular provision set forth herein is invalid, unenforceable or void under the applicable law in a particular jurisdiction, such provision will not be enforced in that jurisdiction but shall remain effective and enforceable in all other jurisdictions.

**Morgan Stanley** | MY PRACTICE CUSTOM REPORT
Feb 16, 2016

## Growth Award Contract

Arthur Irving martin
PRINCETON NJ LOC

17. Employee acknowledges and agrees that, before agreeing to this Agreement, including the arbitration agreement set forth at paragraph 7 hereof, Employee had the opportunity and a reasonable period of time to review and consider this Agreement, including the arbitration agreement set forth herein and the CARE Guidebook, to review and discuss this Agreement, including the arbitration agreement and the CARE Guidebook with counsel of Employee's choice, and to raise any questions Employee wishes of Morgan Stanley.

IN WITNESS WHEREOF, the parties have caused this Agreement to be on the date first hereinabove written.

[1] Information about FINRA, including its arbitration rules, can be found at FINRA's website (www.finra.org).
[2] Information about JAMS, including its arbitration rules, can be found at JAMS' website (www.jamsadr.com).

☐ **By checking here and submitting below, I am agreeing to all terms and conditions of the above Growth Award Bonus Agreement,and waive any applicable rights to require an original (non-electronic) signature or delivery or retention of non-electronic records of the Growth Award Bonus Agreement.**

# EXHIBIT C

## Morgan Stanley | MY PRACTICE CUSTOM REPORT
Feb 16, 2016

### Growth Award Contract
Wade Robert Martin
PRINCETON NJ LOC

#### Growth Award Contracts

| 2015 Growth Award Details | As of: Feb 16, 2016 |
|---|---|
| Advisor Name | Martin, Wade Robert |
| Forecasted Growth Award ($) | 118,593.51 |

| 2015 Growth Award Status | As of: Feb 16, 2016 |
|---|---|
| Growth Award Document | Both 'Growth Award Bonus Agreement' and 'Promissory Note' Approved |
| Bonus Agreement | Approved on Feb 16 2016 3:53PM |
| Promissory Note | Approved on Feb 16 2016 3:53PM |

**2015 GROWTH AWARD BONUS AGREEMENT**

**EMPLOYEE NAME: Martin, Wade Robert**

**AMOUNT-BONUS PAYMENT: $23,718.70**

This Growth Award Bonus Agreement (the "Agreement") is made this 15th day of March, 2016, by and between Morgan Stanley Smith Barney LLC, a Delaware limited liability company ("Morgan Stanley"), and the above-named employee ("Employee").

WHEREAS Employee is currently employed as a financial advisor/private wealth advisor by Morgan Stanley;

WHEREAS, Morgan Stanley has determined that Employee will be eligible to receive certain bonus payments as described in this Agreement, provided that Employee satisfies the terms and conditions set forth in this Agreement; and

WHEREAS, Employee desires to accept the terms and conditions of the bonus payments described in this Agreement, including agreeing to the covenants as set forth in this Agreement.

NOW THEREFORE, Morgan Stanley and Employee agree as follows:

1. In consideration of Employee's anticipated continued employment with Morgan Stanley and the recognition of the value of such services to be rendered by Employee with Morgan Stanley, and subject to the other provisions of this Agreement, if Employee remains continuously employed, in good standing, with Morgan Stanley, meets Morgan Stanley's expectations for good guardianship, and complies with applicable policies and regulations, Morgan Stanley shall pay to Employee a bonus payment within fifteen (15) business days following March 15th, 2017, the amount of which shall be determined by Morgan Stanley, in its sole discretion, in March 2016 (the "Bonus Payment"), but which amount shall be not less than the Bonus Payment amount listed above; provided that, to receive the Bonus Payment, Employee must be employed by Morgan Stanley, in good standing, on the date of payment of such Bonus Payment. Thereafter, on each March 15th thereafter, through and including March 15th, 2021, Morgan Stanley will pay to Employee the Bonus Payment within fifteen (15) business days following the applicable March 15th, provided that Employee continues to be employed by Morgan Stanley, in good standing, on the date of payment of the Bonus Payment. Any such Bonus Payment, when paid, may, at Morgan Stanley's discretion, be applied to repay any outstanding indebtedness owed by Employee to Morgan Stanley or any of its affiliates.

All payments hereunder shall be subject to withholding of all applicable Federal, state and local income taxes, as well as FICA, and all other employment taxes required by law to be withheld. Employee shall be solely responsible for all income and employee-side employment taxes that result from Employee's receipt of the Bonus Payments. The Bonus

**Morgan Stanley**

## Growth Award Contract

Payments shall not be eligible for computation of benefits or compensation under any Morgan Stanley, or any related entity or affiliate compensation or benefits plans, including any wealth or capital accumulation plan.

2. No Bonus Payment shall become due and payable hereunder unless (a) Employee is continuously in the employ of Morgan Stanley, in good standing, from the date of this Agreement, to and including the date such payment is due and payable according to the schedule described in paragraph 1 above, and (b) Employee has maintained all licenses and registrations from the Financial Industry Regulatory Authority, exchanges, state securities commissions and other regulatory bodies as Morgan Stanley shall determine necessary in order to conduct securities or futures transactions; provided, that, in the event Employee has not obtained or retained all such licenses and registrations at the time the bonus is payable, such amounts scheduled to be paid will be forfeited. As used herein, the term "good standing" shall mean, among other things, that Employee is current on the payment of all outstanding financial obligations to the Firm. Furthermore, if Employee is determined to have engaged in activity that is inconsistent with Morgan Stanley's expectations for good guardianship, or not in line with any policy or regulation or otherwise counter to the best interests of Morgan Stanley's clients, including with respect to any revenues used in the calculation of the Bonus Payment, then Employee may be deemed, in Morgan Stanley's discretion, not to have qualified for any Bonus Payments, and Morgan Stanley may, in its discretion, cancel or reduce the Bonus Payment. In the event Employee's employment terminates voluntarily or involuntarily for any reason or no reason other than on account of death or Disability (as defined below) after this Agreement is executed by all parties hereto, Employee shall not be entitled to receive any future Bonus Payments under this Agreement. If Employee's employment with Morgan Stanley terminates on account of death or Disability, Morgan Stanley shall pay to Employee (or Employee's estate, in the event of death) a lump sum cash payment in an amount equal to the total Bonus Payments that would have been payable to Employee for the remainder of the period described in paragraph 1 above if Employee had remained employed in good standing with Morgan Stanley, which amount shall first be applied to repay any outstanding indebtedness owed by Employee to Morgan Stanley or any of its affiliates, and the remainder of which shall be paid to Employee (or Employee's estate, in the event of death). Such lump sum shall be paid within sixty (60) days following the date of Employee's termination of employment with Morgan Stanley on account of death or Disability. For purposes of this Agreement, the term "Disability" shall mean Employee has proven to be totally disabled under Morgan Stanley's long-term disability program whether or not Employee is covered under that program.

3. Other than as set forth herein, Employee agrees that Employee is not entitled to any other compensation from Morgan Stanley or any of its affiliated entities in connection with the Growth Award Program.

4. This Agreement does not prohibit or restrict Employee from lawfully (a) initiating communications directly with, cooperating with, providing relevant information to, or otherwise assisting in an investigation by: (i) the Securities and Exchange Commission ("SEC"), FINRA, or any other governmental or regulatory body or official(s) or self-regulatory organization ("SRO") regarding a possible violation of any federal law relating to fraud or any SEC rule or regulation; or (ii) the EEOC or any other governmental authority with responsibility for the administration of fair employment practices laws regarding a possible violation of such laws; (b) responding to any inquiry from such authority, including an inquiry about the existence of this Agreement or its underlying facts or circumstances; or (c) testifying, participating, or otherwise assisting in an action or proceeding relating to a possible violation of any such law, rule, or regulation. Further, nothing in this Agreement shall prohibit or restrict Employee (or Employee's attorney) from initiating communications directly with, or responding to any inquiry from, or providing testimony before, the SEC, FINRA, or any other SRO or any other federal or state regulatory authority, regarding this Agreement or its underlying facts or circumstances, or regarding any potentially fraudulent or suspicious activities. Nor does this Agreement require Employee to notify Morgan Stanley or any of its affiliated entities of such communications or inquiry described in this paragraph 4.

5. This Agreement and any Bonus Payment payable hereunder shall not be subject to option or assignable either by voluntary or involuntary assignment or by operation of law including (without limitation) bankruptcy, garnishment, attachment or other creditors' process; provided, however, that the provisions of this paragraph 5 shall not apply to any successor, parent, affiliate or subsidiary of Morgan Stanley. Upon the purported grant by Employee of an option over, or purported assignment by Employee of, any Bonus Payment in contravention of the preceding sentence, the obligation of Morgan Stanley to pay such Bonus Payment shall be extinguished, and neither Employee nor any other party shall have any further right thereto.

Morgan Stanley | MY PRACTICE CUSTOM REPORT
Feb 16, 2016

| Growth Award Contract | Wade Robert Martin |
| | PRINCETON NJ LOC |

6. Except as provided in paragraph 7 below, this Agreement (a) contains the entire agreement between the parties relating to Bonus Payments to be paid to Employee in connection with the present Growth Award Program, and supersedes any prior oral or written agreement relating to such payments and (b) cannot be altered or amended except by a written agreement executed by Morgan Stanley and Employee. Notwithstanding the foregoing, Morgan Stanley retains the right to make modifications to this Agreement, other than the provisions of paragraph 7 below, that it deems advisable, in its sole discretion, to allow it, its parents, and/or affiliates to comply with or satisfy any legal, regulatory, or governmental requirements or to qualify for any government loan, subsidy or other program.

7. Arbitration Agreement

(a) Except as provided herein, and to the fullest extent permitted by law, any controversy or claim arising out of or in any way relating to this Agreement or any benefits or payments available and/or due under this Agreement, as well as any controversy or claim between Employee and Morgan Stanley, or any of Morgan Stanley's former, existing, and future domestic parents, subsidiaries, partners, predecessors, successors and affiliate corporations and business entities, or any of its or their current, former, and future directors, officers, employees, agents, managers, shareholders, and other representatives, based on, arising out of, or which arose out of or in any way relate to Employee's employment, compensation, and terms and conditions of employment with Morgan Stanley or any of Morgan Stanley's former, existing, and future domestic parents, subsidiaries, partners, predecessors, successors and affiliate corporations and business entities or the termination thereof, and claims based on, arising out of , or which arose out of or in any way relate to Employee's recruitment or application for employment and hiring, including, but not limited to contract, tort, defamation, breach of fiduciary duty and other common law claims, wage and hour claims, statutory discrimination, harassment and retaliation claims, and claims under, based on, or relating to any federal, state or local constitution, statute or regulation of any country, state or municipality, including, without limitation, the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the Worker Adjustment and Retraining Notification Act ("WARN"), the Equal Pay Act ("EPA"), the Americans With Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and any other federal, state or local wage and hour, discrimination or employment law, and any and all other federal, state, or local constitutional, statutory, regulatory, or common law claims or causes of action now or hereafter recognized, (individually and collectively referred to herein as "Covered Claims", will be resolved by final and binding arbitration as set forth in this arbitration agreement and in the arbitration provisions of the CARE Guidebook, a copy of which can be found by visiting the HR Policies site on the Firm's intranet or by requesting it from CAREbox@morganstanley.com. **This arbitration agreement applies with respect to all Covered Claims, whether initiated by Employee or Morgan Stanley, including any Covered Claims based on, arising out of, or which arose out of or in any way relate to acts and omissions that occurred before you and Morgan Stanley entered into this Arbitration Agreement, and makes arbitration the required and exclusive forum for the resolution of all Covered Claims. By entering into this arbitration agreement, Employee and Morgan Stanley each acknowledge and agree that, to the fullest extent permitted by law, Employee and Morgan Stanley are giving up any right to a jury trial in any forum.**

(b) Except as specified herein or in the CARE Guidebook, any arbitration of a Covered Claim will be conducted under the auspices and rules of the Financial Industry Regulatory Authority ("FINRA") in accordance with the FINRA Code of Arbitration Procedure for Industry Disputes ("FINRA Arbitration Rules").[1] If a Covered Claim may not be arbitrated before FINRA or is ineligible for or otherwise excluded from or not subject to arbitration before FINRA, then such Covered Claim will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Employment Arbitration Rules and Procedures and the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness ("JAMS Arbitration Rules"),[2] except as specified herein or in the CARE Guidebook. In addition, employment discrimination claims under or based on any federal, state or local law (including claims of harassment and retaliation under those laws) will be resolved by final and binding arbitration conducted under the auspices and rules of JAMS in accordance with and subject to the JAMS Arbitration Rules, except as specified herein or in the CARE Guidebook. To the extent any of the terms, conditions or requirements of the arbitration agreement in this paragraph 7 conflict with the JAMS Arbitration Rules or FINRA Arbitration Rules, the terms, conditions or requirements of this arbitration agreement shall govern. Except as specified herein, the applicable arbitration rules will be the rules of the selected arbitration forum as indicated above, or any successor rules or, if none exist, the rules most applicable to employment claims and disputes and, if the forum no longer exists, the successor forum or, if neither the forum nor a successor forum exists, the rules most applicable to employment claims and disputes of a similar forum.

Morgan Stanley | MY PRACTICE CUSTOM REPORT
Feb 16, 2016

**Growth Award Contract**

Wade Robert Martin
PRINCETON NJ LOC

(c) The following claims and disputes are not Covered Claims and are not subject to this arbitration agreement: (i) applications by any party for temporary or preliminary injunctive relief in aid of arbitration or for the maintenance of the status quo pending arbitration, (ii) claims for workers' compensation benefits, but not retaliation claims arising out of or relating to claims for workers' compensation benefits, (iii) claims for unemployment compensation benefits, (iv) claims under the National Labor Relations Act, as amended within the exclusive jurisdiction of the National Labor Relations Board, and (v) any claim that is expressly precluded from arbitration by a federal statute. This arbitration agreement also does not apply to any claim in a court action in which Employee is individually named as a plaintiff, opt-in plaintiff, defendant or other named party and which is pending in court on the date this Agreement was sent to Employee, or to any claim in a certified or uncertified class, collective, or representative action which is pending in court on the date this Agreement was sent to Employee, and any such claims shall be governed by the most recent arbitration agreement between Employee and Morgan Stanley applicable to such claims. Nothing in this Agreement shall prohibit Employee from filing a charge, complaint or claim or communicating or cooperating with, providing information to, or participating in an investigation by the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the U.S. Department of Labor, the Occupational Safety and Health Commission, or any other federal, state, or local administrative agency. Employee also has the right to challenge the validity of the terms and conditions of the arbitration agreement in this paragraph 7 on any grounds that may exist in law and equity, and Morgan Stanley shall not discipline, discharge, or engage in any retaliatory actions against Employee in the event Employee chooses to do so or engages in other protected legal activity. Morgan Stanley, however, reserves the right to enforce the terms and conditions of this arbitration agreement in any appropriate forum.

(d) WAIVERS. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EMPLOYEE AND MORGAN STANLEY AGREE THAT NO COVERED CLAIMS MAY BE INITIATED, MAINTAINED, HEARD OR DETERMINED ON A CLASS ACTION, COLLECTIVE ACTION, OR REPRESENTATIVE ACTION BASIS EITHER IN COURT OR IN ARBITRATION, AND THAT EMPLOYEE IS NOT ENTITLED TO SERVE OR PARTICIPATE AS A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION MEMBER OR REPRESENTATIVE OR TO RECEIVE ANY RECOVERY FROM A CLASS, COLLECTIVE OR REPRESENTATIVE ACTION INVOLVING COVERED CLAIMS EITHER IN COURT OR IN ARBITRATION. Employee further agrees that if Employee is included within any class action, collective action, or representative action in court or in arbitration involving a Covered Claim, Employee will take all steps necessary to opt-out of the action or refrain from opting in, as the case may be. Any issue concerning the validity or enforceability of any of the class action, collective action, and representative action waivers contained in this arbitration agreement ("Waivers") shall be governed by and determined under and in accordance with the FAA, and shall be decided by a court of competent jurisdiction, and not by an arbitrator. Any issue concerning arbitrability of a particular issue or claim pursuant to this arbitration agreement (except for issues concerning the validity or enforceability of the class action, collective action, or representative action Waivers) must be resolved by the arbitrator, not the court. Insofar as any Covered Claim is permitted to proceed on a class action, collective action, or representative action basis, it must do so in a court of competent jurisdiction and not in arbitration. Insofar as any Covered Claim is not eligible for arbitration or otherwise is excluded from or not subject to arbitration, for any reason, the class action, collective action, and representative action Waivers apply and remain valid and enforceable with respect to such Covered Claim. For the sake of clarity, nothing in this arbitration agreement shall preclude Employee from pursuing or participating in any claim, including any class action, collective action, or representative action in court where Employee's claim is based solely on Employee's status as a customer or an investor and does not arise out of or in any way relate to Employee's employment relationship with Morgan Stanley.

(e) Arbitration shall be held in the county of Employee's current or last principal place of employment with Morgan Stanley or, if not practicable, in the county closest to Employee's current or last principal place of employment with Morgan Stanley where the arbitration can be held. If Employee's current or last principal place of employment with Morgan Stanley is outside of the U.S., the arbitration shall be held in New York, New York.

(f) Arbitrators are required to issue a written award and, subject to the parties' right to appeal or seek vacatur under applicable law, their awards shall be final and binding, and any judgment or award issued by the arbitrator may be entered in any court having competent jurisdiction. No arbitration award or decision will have any preclusive effect as to any issues or claims in any other arbitration or court proceeding unless each of the parties in such proceeding was also a named party in the arbitration.

**Morgan Stanley** | MY PRACTICE CUSTOM REPORT
Feb 16, 2016

Growth Award Contract
Wade Robert Martin
PRINCETON NJ LOC

(g) Arbitrators are authorized to award any party the full remedies that would be available to such party if the Covered Claim had been filed in a court of competent jurisdiction, including attorneys' fees and costs. Thus, for example, Employee shall be entitled to recover attorney's fees and costs in any arbitration in which Employee asserts and prevails on any statutory claims or counterclaims to the same extent as Employee could in court.

(h) Additional Provisions Applicable to Arbitration at JAMS

(i) Arbitrators. Any arbitration of Covered Claims before JAMS shall be conducted before a single arbitrator, unless all parties to the arbitration agree in writing to conduct the arbitration before a panel of three arbitrators.

(ii) Procedure. The parties may file and the JAMS arbitrator shall hear and decide at any point in the proceedings any motion permitted by the Federal Rules of Civil Procedure, including but not limited to motions to compel discovery, motions for protective orders, motions to dismiss, motions for summary judgment, and motions in limine. In addition, the arbitration shall be subject to the same rules of evidence, burdens of proof and statutes of limitations as if the Covered Claim was being heard in the appropriate federal or state court.

(iii) Awards. JAMS Arbitrators are required to issue a written award, which shall include a reasoned and detailed decision stating the reasons upon which it is based and supported by essential facts and conclusions of law.

(iv) Arbitration Fees. Except as provided by law and as provided below for statutory claims and counterclaims, in any arbitration before JAMS, Employee shall be responsible for any filing fee required to initiate arbitration or to assert any counterclaims up to the amount of the filing fee if any Employee would have incurred had Employee filed such claims in court, and Morgan Stanley shall be responsible for all additional arbitration filing fees, forum fees, arbitrator fees, and other administrative fees and costs of the arbitration forum.

(i) Additional Provisions Applicable to Statutory Claims and Counterclaims. Subject to any applicable fee-shifting provisions, if Employee initiates arbitration of statutory claims with FINRA or JAMS or asserts any statutory claims as counterclaims, Employee shall be responsible for the filing fee required to initiate arbitration of such claims or to assert such counterclaims up to the amount of the filing fee Employee would have incurred had Employee filed such claims in court, and Morgan Stanley shall be responsible for all additional arbitration filing fees, forum fees, arbitrator fees, and other administrative fees and costs of the arbitration forum.

8. All Bonus Payments payable under this Agreement are intended to be exempt from section 409A of the Internal Revenue Code of 1986, as amended (the "Code") in reliance on the short-term deferral exemption set forth in the final regulations issued thereunder. Notwithstanding the foregoing, if it is subsequently determined that the Bonus Payments payable under this Agreement are not so exempt, then this Agreement shall be administered and interpreted in a manner intended to cause the Bonus Payments to comply with section 409A of the Code, such that the accelerated taxation and tax penalty provisions of section 409A of the Code do not apply to the Bonus Payments. In addition, if the Bonus Payments constitute deferred compensation subject to the requirements of section 409A of the Code and such amounts are payable to Employee upon "separation from service" (within the meaning of section 409A(a)(2)(a)(i) of the Code and its corresponding regulations) from Morgan Stanley, then if Employee is a "specified employee" (as such term is defined in section 409A(2)(B)(i) of the Code and its corresponding regulations) as determined by Morgan Stanley (or any successor thereto), in its sole discretion, then all payments to Employee on separation from service pursuant to this Agreement shall be postponed for a period of six (6) months following Employee's separation from service from Morgan Stanley. The postponed amounts shall be distributed to Employee within thirty (30) days after the date that is six (6) months following Employee's separation from service from Morgan Stanley. No delay is required if Employee's separation from service is on account of death. In no event may Employee designate the calendar year in which the Bonus Payments will be paid. While the Bonus Payments payable under this Agreement are intended to be exempt from section 409A of the Code, neither Morgan Stanley or any of its

**Morgan Stanley** | MY PRACTICE CUSTOM REPORT
Feb 16, 2016

## Growth Award Contract

Wade Robert Martin
PRINCETON NJ LOC

affiliates has made any representation, warranty or guarantee of any federal, state or local tax consequences of Employee's receipt of the Bonus Payments hereunder, including, but not limited to, under section 409A of the Code.

9. Any obligation set forth hereunder to provide payment of the Bonus Payments to Employee is the obligation of Morgan Stanley. Morgan Stanley's affiliated entities shall have no obligation to provide payment of the Bonus Payments to Employee, are not guaranteeing any such payments, and shall not have any liability to Employee with respect to such payments.

10. Any breach of this Agreement by Employee shall result in the forfeiture of Employee's right to further Bonus Payments pursuant to this Agreement.

11. This Agreement is not a contract of employment for any period of time. Employee's employment with Morgan Stanley is on an at-will basis and nothing herein shall be construed as a contract of employment for a definite term. Accordingly, Employee's employment can be terminated at any time with or without cause at the option of either Employee or Morgan Stanley.

12. All notices, requests, demands and other communications to be given to the Employee pursuant to this Agreement shall be in writing and shall be deemed to have been duly given if delivered by hand, e-mail or overnight courier or mailed by registered or certified mail, return receipt requested, postage prepaid addressed to the Employee's last known address or such other address as the Employee shall have designated by notice in writing to Morgan Stanley, or any successor thereto, in accordance with this paragraph. All notices, requests, demands and other communications to be given to Morgan Stanley pursuant to this Agreement shall be in writing and shall be deemed to have been duly given if delivered by hand, e-mail or overnight courier or mailed by registered or certified mail, return receipt requested, postage prepaid addressed to the address set forth in the corporate records or such other address as Morgan Stanley shall have designated by notice in writing to Employee in accordance with this paragraph.

13. This Agreement shall inure to the benefit of Morgan Stanley and its affiliates, parents, subsidiaries, successors, or assigns, whether through merger, acquisition, sale or other transfer. Morgan Stanley retains the right to assign its rights, title and interest in this Agreement as it may elect. Employee expressly consents to any such, or any subsequent, assignment.

14. Employee further acknowledges that the Bonus Payments payable under this Agreement exceed any payment or thing of value to which Employee is otherwise entitled, and are just and sufficient consideration for the agreements, waivers, and commitments set forth herein.

15. As stated above, the provisions of the arbitration agreement in paragraph 7 hereof, including the Waivers set forth in paragraph 7(d) of the arbitration agreement, shall be governed by and interpreted in accordance with the FAA. The remaining provisions of this Agreement shall be governed by and interpreted in accordance with the laws of the State of New York, without regard to conflicts of laws principles.

16. The provisions of this Agreement shall be severable and, if any provision of this Agreement shall be determined to be legally unenforceable or void, such unenforceable or void provision shall not affect the legality, validity or enforceability of the remaining provisions hereof and may be severed from the remaining provisions as appropriate, to the extent permitted by law. In the event any of the Waivers set forth in paragraph 7(d) above are determined to be invalid, unenforceable or void with respect to a particular Covered Claim, that Covered Claim and only that Covered Claim shall proceed in a court of competent jurisdiction and not in arbitration (and such court shall be the exclusive forum for such claim) and the Waivers set forth in paragraph 7(d) above shall remain effective and enforceable with respect to all other Covered Claims. If a court of competent jurisdiction determines that a particular provision set forth herein is invalid, unenforceable or void under the applicable law in a particular jurisdiction, such provision will not be enforced in that jurisdiction but shall remain effective and enforceable in all other jurisdictions.

**Morgan Stanley** | MY PRACTICE CUSTOM REPORT
Feb 16, 2016

## Growth Award Contract

Wade Robert Martin
PRINCETON NJ LOC

17. Employee acknowledges and agrees that, before agreeing to this Agreement, including the arbitration agreement set forth at paragraph 7 hereof, Employee had the opportunity and a reasonable period of time to review and consider this Agreement, including the arbitration agreement set forth herein and the CARE Guidebook, to review and discuss this Agreement, including the arbitration agreement and the CARE Guidebook with counsel of Employee's choice, and to raise any questions Employee wishes of Morgan Stanley.

IN WITNESS WHEREOF, the parties have caused this Agreement to be on the date first hereinabove written.

[1] Information about FINRA, including its arbitration rules, can be found at FINRA's website (www.finra.org).
[2] Information about JAMS, including its arbitration rules, can be found at JAMS' website (www.jamsadr.com).

☐ **By checking here and submitting below, I am agreeing to all terms and conditions of the above Growth Award Bonus Agreement,and waive any applicable rights to require an original (non-electronic) signature or delivery or retention of non-electronic records of the Growth Award Bonus Agreement.**